JOHN W. WHALLON v. CIRCUIT JUDGE FOR INGHAM COUNTY.

*Holding court elsewhere than at county seat.*

The Constitution of Michigan forbids the removal of a county seat without a popular vote. *Held*, that a statute authorizing terms of the circuit court for Ingham county to be held at Lansing, the State capital, instead of at Mason, the county seat, both places being within the county, is not unconstitutional on the ground that it takes the clerk of the circuit court away from the county seat, where his office is established, since the same Constitution made the clerk of the circuit court the clerk also of the Supreme Court, which sits at the capital, and the circuit court itself has been given exceptional statutory powers as a forum for litigation to which the State is a party.

The Legislature, in empowering circuit judges to fix the time for holding terms of court, does not divest itself of power to change the times so fixed.

There is nothing in the history of county institutions in England, nor in the course of Michigan legislation since the Ordinance of 1787, to establish so uniform a system with regard to the place of holding the circuit court for the county that holding it elsewhere than at the county seat should be in itself, and apart from any constitutional provision, a violation of constitutional principles.

Under the Michigan system, the sheriff and the county clerk are officers of the circuit court for the county while it is in session, and during that period are subject to the direction of the circuit judge in all matters pertaining to the administration of justice.

Mandamus. Submitted Oct. 4. Denied Oct. 5–17.

*William P. Wells* and *Austin Blair* for relator.

*John C. Shields, Schuyler F. Seager* and *Isaac Marston* for respondent.

SHERWOOD, J. The Legislature at its last session passed an act of which the following is a copy :

SECTION 1. *The People of the State of Michigan enact,* That two of the regular terms of the circuit court for the county of Ingham, heretofore appointed, shall be held during the remainder of the year A. D. eighteen hundred and eighty-three, within the city of Lansing, and during each year thereafter, two of the regular terms of said court shall be held within said city : *Provided,* That the common council of said city, or the citizens thereof, shall furnish and provide, free of expense to said county, a suitable place for holding said court, within said city, and transacting the business thereof, and also a suitable and sufficient jail, for the incarceration of prisoners during the sittings of said court, both to be inspected and approved by the judge of said court, or the prosecuting attorney of said county, which approval shall be in writing, and shall be filed with the clerk of said county.

SEC. 2. Within ten days after this bill shall take effect and become a law, and said approval be so filed, the circuit judge of the fourth judicial circuit shall designate which of the two regular terms of the circuit court for said county of Ingham, heretofore appointed for the year A. D. eighteen hundred and eighty-three, shall be so held within said city, which designation shall be in writing, and shall be immediately thereafter transmitted by him to the clerk of said county.

SEC. 3. The judge of said circuit shall thereafter, when fixing and appointing times of holding the several terms within his circuit, in such appointment determine and designate which of the regular terms, to be then fixed and appointed, shall be so held within said city of Lansing, for the two years then next ensuing.

Approved May 11, 1883.

In pursuance of said act, and in accordance with its requirements, the common council of the city of Lansing provided a suitable place for holding said circuit court and transacting the business thereof in the city; also a jail for the purposes stated in the act; and on the 15th day of September the presiding judge in said circuit, by proper order for the purpose, designated two of the regular terms of said court, one in October and the other in December, 1883, to be held in Barnes' block in said city.

On the 19th of September said circuit judge caused to be made and directed to the relator the following order :

"STATE OF MICHIGAN—CIRCUIT COURT FOR THE COUNTY OF INGHAM.

*To John W. Whallon, Esq., Clerk of said County*—SIR: You are hereby required and directed to be and appear at the said circuit court to be held at the city of Lansing, at the rooms of the building heretofore designated by me, which designation is on file in your office, for the purpose of holding such court therein, on the second Monday of October next, at the opening of the court on that day, and to act as clerk thereof during the sitting of the same; and also that you do bring with you, ready to be used in the business of said court, the law and chancery journals thereof, the common rule book and special motion book kept in your office, and all the files and papers in your office, in each and every case that has been, or may be hereafter, placed upon the calendar of said court, for hearing or trial at the next term thereof; to be holden at the city of Lansing on the day aforesaid.

G. T. GRIDLEY, Circuit Judge.

*Dated September* 19, 1883."

Upon the receipt and filing of this order by the relator, he presented to the circuit judge for said county of Ingham the following petition :

"*To Hon. G. T. Gridley, Circuit Judge in and for the Circuit Court for the County of Ingham:* The petition of John W. Whallon, county clerk for the said county of Ingham, respectfully shows that he has received and filed in the said clerk's office the three several orders made by the Hon. the circuit judge for said circuit court for the county of Ingham, copies of which are hereto attached.

That your petitioner is greatly embarrassed by the said orders, which seem to him in clear violation of the Constitution and laws of this State. Your petitioner, therefore, requests that the said orders, and each of them, may be vacated and set aside for the reasons following, to-wit:

1st. Because the said Act number 85 of the Session Laws of 1883, is null and void, the city of Mason being the county seat of said county of Ingham, and the said Legislature had no power to remove the same to the city of Lansing, such power being only in the Board of Supervisors of said county, in pursuance of section 8, of article 10 of the Constitution of this State.

2d. Because, by the Constitution of this State, (section 4 of article 10,) the sheriff and county clerk are required to hold their offices at the county seat, which is and has been at the city of Mason for many years, and not at the city of Lansing; and the statutes of this State also require the sheriff and clerk to hold their offices at the county seat.

3d. Because the said Act No. 85 has not conferred upon the said circuit judge any authority to make any order requiring the sheriff and clerk to remove their offices to the city of Lansing, or to attend courts at any other place than the county seat of said county.

4th. Because the said Legislature has no authority to require the holding of circuit courts in organized counties at any other place than at the county seat; that the said county of Ingham has a court-house and jail at Mason, and the said sheriff and clerk both hold their offices there, as they have always done, and great inconvenience and confusion would arise if they attempt to remove their offices, papers and records away from the said county seat.

And your petitioner will ever pray, etc.

JOHN W. WHALLON."

Which said petition was duly considered by said circuit judge, and on the 26th day of September was denied. And thereupon said relator filed his petition in this Court for a mandamus requiring said circuit judge to vacate and set aside said last-named order, for the following reasons:

1. Because the above-mentioned Act of the Legislature is inoperative and void, as being in violation of section eight of article ten of the Constitution of this State; the county seat of said county of Ingham having been established as aforesaid, and now being at said city of Mason, the Legislature could not lawfully provide for the removal of the same therefrom in whole or in part, except in the manner provided by said section.

2. Because said Act and the above-mentioned order upon your petitioner are in violation of section four of article ten of the Constitution of this State, by which your petitioner is required to keep his said office at the county seat of said county, which is, and for many years has been, at the city of Mason, and not at said city of Lansing. And because, also, your petitioner is required by the General Statutes of this State to hold and keep his said office at the county seat.

3. Because the Legislature were without power, and could not lawfully require the terms of said circuit court to be held at any place in said county other than the county seat therein.

4. Because said Act of the Legislature does not confer upon said circuit judge any power or right to require your petitioner to attend upon the session of said court at the city of Lansing, or to remove his said office or any part thereof, or the books, papers, records or files belonging thereto or kept therein to said city of Lansing, or away from said county seat.

5. Because the removal of such records, books, papers and files, in obedience to said order, would be contrary to the rights of your petitioner in the premises, as well as the public and individual persons interested in such records, books, papers and files, and would be attended with great inconvenience, confusion and hazard."

To this petition the respondent demurs.

It is urged in behalf of the relator that the Act under consideration does not, by its provisions, require or direct the clerk or sheriff to be present or attend the sessions of said circuit court to be held at Lansing. If the Legislature had the power to require any of the terms of the circuit court to be held at Lansing, sections 5620 and 6002 of the Compiled Laws sufficiently specify the duties of these officers; but, independently of these sections, we think it

within the power of the circuit judge to command the services of these officers at the regular terms of the court. They are officers of the court, and subject to its direction in all things necessary to a proper administration of the law during its sessions.

It is also claimed by relator that the Legislature has no power to change the regularly appointed terms of the court. The number of terms of the circuit court and the time of holding the same have always been discretionary with the Legislature, provided there shall be at least two in every county, and in counties of ten thousand inhabitants, or over, at least four terms held in each year, as required by the Constitution. Article 6 § 11; 2 Comp. L. §§ 4939, 4979; *People v. Northrup* 50 Barb. 147; also in 37 N. Y. 203; *Bouldin v. Ewart* 63 Mo. 330; *People v. Moneghan* 1 Park. Crim Rep. 570; *Northrup v. People* 4 Abb. Pr. (N. S.) 227. Under our statute the Legislature has conferred the power upon the circuit judge to fix the time for holding the several terms. 2 Comp. L. p. 1508, sec. 3, § 4939. In doing this, however, it has not divested itself of the power to change the times fixed by the circuit judge. *Ex parte Charles Shean* 25 Ohio St. 440. There is no limitation on the power of the Legislature in this regard, except as hereinbefore referred to. The Act in question does not change the number of terms fixed by the circuit judge before its passage, neither is it sought thereby to change the time appointed for holding the same, but to change the place in the county at which two of the terms shall be held.

The important question raised by the demurrer to the relator's petition is the constitutionality of the Act authorizing the change of the place at which two of the terms are to be held, from Mason to Lansing. The relator claims such change is in violation of art. 10, sec. 8 of the Constitution, which reads as follows:

"No county seat once established shall be removed until the place to which it is proposed to be removed shall be designated by two-thirds of the board of supervisors of the county, and a majority of the electors voting thereon

shall have voted in favor of the proposed location, in such manner as shall be prescribed by law."

Counsel for relator maintain that "county seat," as used in this section of the Constitution, means the same as "seat of justice;" that the terms are synonymous; that the holding of courts at the county seat must be taken for granted as being the chief object for which a county seat was established; and that when a county seat is established it draws to it, ex necessitate rei, the holding of courts there; and they make reference to the origin of counties in our political and judicial system, and their organization, and the action of the Legislature, territorial and State, in locating and establishing places for holding courts of record within State jurisdiction, to support their views.

A careful examination, however, shows that such actions has not been sufficiently uniform to aid very much in solving the question presented. Under the Act of Congress organizing the Northwest Territory, for the purposes of government the entire territory consisted of one district. The laws were made by the governor and three judges, subject to the disapproval of Congress. These three judges constituted the Supreme Court. The laws were to have force in all parts of the district, and the governor was authorized, for the execution of process, civil and criminal, to make proper division of the district, and to lay out those parts, where the Indian title had become extinct, into townships and counties. 1 Comp. L., pp. 26, 27. No time or place seems to have been fixed or designated at which the courts were to be held. The courts were, however, invested with common-law jurisdiction. Ord. 1787, paragraph 4. Just what course was pursued by the Governor and Judges upon this subject, under this ordinance, within the territory included within this State, does not very clearly appear.

The territorial government of Michigan was organized in 1805, and the legislative power continued in the Governor and Judges of the territory until 1824. During this period many counties were established, and their bounda-

ries early defined, and it was customary, when it became necessary to hold courts of record therein, for the Governor and Judges to designate by their own action, or through commissioners appointed for that purpose, (whose action was subject to the governor's approval,) the seat of justice in such counties. 3 Terr. Laws 840; id. 1379, 899 and 908. The supreme court of the territory was the first court organized, and was required to be held at the seat of government, and its location has always been a subject of legislative discretion. 1 Terr. L. 9. In certain cases a change was permitted, as in case of war, pestilence or other public calamity. 1 Terr. L. 9, 15, 16.

On the organization of this court the territory was divided into three districts, and a district court was established in each. The number of terms to be held, and time of holding same, were fixed in the Act of organization. No particular place was mentioned at which the terms of the court were to be held, that being left entirely with the marshal of the territory. 1 Terr. L. 17, 18. The clerk of each of these courts was appointed by the judges thereof. id. 10, 18; 2 Terr. L. 60.

The county court was established in 1815, and under the territorial jurisdiction and until the territory contained more than one county, it was required to be held at Detroit. 1 Terr. L. 184. The Governor appointed the clerk of this court. 1 Terr. L. 716 § 9.

The circuit courts were organized under our territorial existence in 1825. 2 Terr. L. 265. Under the act creating the same they were required to be held in certain counties named in the act, and in *certain places specifically named* at the court-houses in said counties, and the clerks of the county courts were required to perform the duties of the office of clerks of such circuit courts.

In 1833 the circuit court of the territory was reorganized. One was established in each organized county. The clerks of the several counties were charged with the duties of the clerk of said court, and the county court was abolished. 3 Terr. L. 1022.

In none of these enactments is it assumed or taken for granted that the circuit court was to be held at the county seat, but the place was especially named or indicated when the designation thereof was not intrusted to the marshal or Governor.     1 Terr. L. 17; id. 183, 186, 326.

Previous to the adoption of the Constitution of 1835 the places of holding courts were almost invariably termed seats of justice.     1 Terr. L. 323, 324, 325, 328, 329, 330.     In but few instances do we find the term "county seat" used in our territorial enactments in connection with holding the circuit court.     We find it used in several instances after the office of supervisor was created for the several townships, and a place for their meetings was to be provided for and certain offices located there.     2 Terr. L. 317, 325; 3 Terr. L. 972.

The district or circuit court was the first court required to be held in the several counties, and the places of holding the same were, in several instances, changed.

I think the various acts of the Governors and Judges, and of the Legislative Council, under our territorial system, pretty clearly indicate that the place of holding the circuit court—or what is termed in those acts the "seat of justice"—and the county seat—did not necessarily mean the same thing.     None of the county officers were required to have their offices at the county seat, until 1832.     3 Terr. L. 972.     The clerk of the county was not charged with the duties of clerk of the circuit court until 1830.     It was the clerk of the county whose office was required to be held at the county seat.     Id. 972; 2 Terr. L. 759.

The county seat has always been the place designated for doing the county business; the place at which the public buildings were to be erected; the place where the probate and county courts were to be held, and the offices of the county clerk, county treasurer, and register of deeds were to be located; and the board of supervisors were to hold their several sessions there.     Laws 1827, p. 379; 2 Terr. L. 270, 625; 3 Terr. L. 972 and 1010; Rev. St. 1838, p. 35.

The circuit court has general common-law jurisdiction,

and has always been a State court, held by judges paid by the State, and is in no sense a local court. Its judges may interchangeably perform the duties of the office in any part of the State. For the convenience of the people its terms are required to be held in the several counties. The place in the county where it is held has always been regarded as the seat of justice for that county. These places have, with an occasional exception, (when the county seat was first established,) been located at the county seat, but do not necessarily constitute a part thereof. The county seat exists without this court, and the location of the seat of justice has always been a subject of legislative discretion.

There has never been any express constitutional provision upon the subject in anywise limiting the power of the Legislature to establish or change the place for holding the circuit court when once located.

We now come to the constitutional provisions and the State legislation had thereunder. In the Constitution of 1835 there is no provision requiring any court or officer to have his office at the county seat or at the seat of justice. In fact, neither of these terms are to be found in that instrument, and it is silent upon the subject as to when the circuit court shall hold its sessions, or who shall designate the place of holding the same. See articles 6 and 7.

After the adoption of this Constitution the State was divided into four judicial circuits. The counties composing each, and the number of terms, and the time for holding the same in each, was by statute specifically designated. Rev. St. 1838, pp. 381, 382, 383. Each county was required to provide a suitable court-house, and it was also provided by statute: "If, by reason of war, pestilence or other calamity, it shall be deemed unsafe or inexpedient to hold any court at the time and place appointed therefor, whether it be a stated term or a session by adjournment, the justices or judges of the court, or any one of them, may appoint another place within the same county, and any other time for holding same." Also, by another section of the same statute, it is provided whenever the court-house

shall be destroyed, or from any cause shall be unsafe, inconvenient or unfit for the holding of the court, the circuit court may appoint some other convenient building in the vicinity as a temporary place for holding the court. Rev. St. 1838 p. 415 §§ 2 and 4.

In the Revision of the statutes in 1838 the court-house was erected for the use of the county, (id. p. 35 § 16,) and there was no general provision requiring the circuit court to be held at the county seat, and there never was any such requirement in either of our State Constitutions, or in any general enactment of the Legislature.

The Revised Statutes of 1846 p. 377, required the county court to be held at the county seat, and the circuit court was required to be held at the court-house, if there was one in the county, and if not the sheriff and county clerk were required to designate the place in the county where it should be held, (Rev. St. 1846 p. 353 § 6,) and the only provision we find, in Constitution or laws, requiring the court-house to be located at the county seat, was enacted more than 25 years after the adoption of our present Constitution. See Pub. Acts 1877 p. 50.

The whole subject was in the power of the Legislature previous to the adoption of the Constitution in 1835. The Legislature was not deprived of that power by that instrument.

Previous to the adoption of our present Constitution the Legislature had in some cases designated the seat of justice as the place of holding the circuit court; in others the county seat; in others at some place away from the county seat. In some instances it authorized the marshal to designate the place; and in others the Governor or commissioners located the place. I regard these facts as very significant upon the question as presented by the relator. Had the people of our State regarded the permanent location of the place of holding the circuit court essential to the establishment of the county seat, I can hardly think they would have failed to have incorporated it in the original act, or at least in some general legislative enactment.

It seems impossible, if the Constitutional Convention designed to permanently establish the holding of the circuit court at the county seat beyond the power of legislative removal, that it should not have inserted a clause in the Constitution of 1850 to that effect. Several minor offices were thus located, as we have already seen. The subject of the circuit court, its terms, the election of the circuit judges, changing the limits of the circuit, and the number of circuits, were repeatedly before the Convention, but no place for holding the circuit court was established by the proceedings of the Convention. Neither do we obtain any information from their proceedings as to the views of the Convention on the subject.

As already shown, under our territorial existence, and under the Constitution of 1835, the Legislature determined the places of holding the circuit court in the several counties, and an examination of the legislation upon this subject, after the adoption of the present Constitution, I think shows satisfactorily the intention to continue the power over this question, where it has always been exercised. See Sess. L. 1855 p. 12; id. pp. 48, 422; Sess. Laws 1851 p. 150; Sess. Laws 1857 p. 162; id. p. 438; Sess. Laws 1859 p. 4; Sess. Laws 1863 p. 297.

The legislation complained of in this petition is not new in this country. In several of the sister states similar action has been taken, and the courts required to be held in several different places in the county, and it has been held the power of the Legislature to make such changes was properly exercised. *Trimble v. State* 2 Iowa (Greene) 404; *Lee County v. Deming* 3 Iowa (Greene) 101; *Bouldin v. Ewart* 63 Mo. 330; *Herndon v. Hawkins* 65 Mo. 265; *Ex parte Shean* 25 Ohio St. 440.

The silence of the Constitution as to where the circuit court shall be held, and the action of the Legislature since its adoption upon this subject, if not sufficient to settle the question conclusively in favor of the power of the Legislature, is, I think, certainly sufficient to raise a reasonable doubt as to the unconstitutionality of the act in question,

and in such case the rule is well settled that the law must be sustained.    Chief Justice Marshall, in stating this rule in *Ogden v. Saunders* 12 Wheat. 270 says: "It is but a decent respect due to the wisdom, the integrity, and the patriotism of the legislative body, by which any law is passed, to presume in favour of its validity, until its violation of the constitution is proved beyond all reasonable doubt." *Scott v. Smart's Ex'rs* 1 Mich. 295; *Sears v. Cottrell* 5 Mich. 251; *Tyler v. People* 8 Mich. 320; Cooley's Const. Lim., and cases cited at page 182.

It is not pretended in this case that the Constitution, in express words, forbids the legislation in question, but by necessary implication does so; that it was intended, when the Constitution was made, to limit the power of the Legislature as claimed; that such is the spirit of the provision in the section relied on.

" 'When the fundamental law has not limited, either in terms or by necessary implication, the general powers conferred upon the legislature, we cannot declare a limitation under the notion of having discovered something in the *spirit* of the constitution which is not even mentioned in the instrument,' " "nor are the courts at liberty to declare an act *void*, because in their opinion it is opposed to a *spirit* supposed to pervade the constitution, but not expressed in words." " 'It is difficult upon any general principles to limit the omnipotence of the sovereign legislative power by judicial interposition, except so far as the express words of a written constitution give that authority.' "    Cooley Const. Lim. 169, 171, 172, 182, and cases cited.

This Court can only arrest the execution of a statute when it conflicts with the Constitution; and, after as careful an examination as I have been able to give to the question presented, I am compelled to say the relator has failed to point out in the Constitution the restriction claimed upon the legislative power to pass the act in question, and I think his petition should be denied, without costs.    I will also add, I concur in what is said by Mr. Justice Campbell, that this county of Ingham is by the Constitution itself

made exceptional. The most important clause which is supposed by implication to locate the circuit court at the county seat, is that which requires the clerk, who is a constituent part of the court, to keep his office at that place; but the force of this, in the case of Ingham county, is wholly overthrown by another clause, which makes him clerk of the Supreme Court, which is located at Lansing.

The other Justices concurred.

CAMPBELL, J.  The Legislature at its last session made provision whereby the circuit judge in whose circuit the county of Ingham lies, was required to designate two of his four terms in each year to be held at Lansing, the seat of government of the State, in said county, and respondent accordingly made an order for holding a term there on Monday, October 8th.  The relator asked this court for a mandamus to compel the respondent to rescind that order, which, after consultation, we refused, the judges reserving further time to reduce their views to writing.  Having concurred in that action of the Court, I therefore proceed to express such views as have occurred to me, concurring, however, with my brother Sherwood in his opinion.

It is not insisted that there is any provision of the State Constitution which prohibits the holding of circuit courts away from county seats directly, but the prohibition is supposed to rest in certain provisions requiring the county clerk, who is expressly made clerk of such courts, to keep his office at the county seat, as the sheriff, treasurer, register of deeds and judge of probate are required to keep theirs in the same place.  This claim is made in connection with a further one, that such a change of terms amounts, as far as it goes, to a partial removal of the county seat to Lansing without the action of the supervisors and voters of the county, which must first be had in favor of it.  It is insisted the clerk and sheriff cannot be taken away from their offices, and that the court itself is an inseparable incident to the county seat.

We are not called on to consider any special theories of

construction, because counsel do not and could not claim that anything can be regarded as prohibited to the Legislature, unless the Constitution stands in the way by the only reasonable interpretation that can be given to its provisions so as to fairly carry out its expressed purposes. Such implications as are necessary to avoid defeating its manifest purposes, and are required to satisfy its provisions, may be properly regarded as express, when they only interpret its expressions.

We may, therefore, consider the questions as they were considered on the argument, and determine as well as we can how far relator is right in his claims.

In my opinion there is no difficulty whatever arising out of the location of the clerk's and sheriff's offices. The Constitution, in express language, as originally enacted and until recently amended, made the clerk of the county, clerk of the Supreme Court, whenever it was held in the county, and it left the places of holding that court to be determined by the Legislature. Terms of the Supreme Court have been held at Lansing for over twenty-five years, and no inconvenience has come from it. There never has been any difficulty in having a clerk appear by deputy in the courts, and if, as has frequently happened, two courts and the board of supervisors or other county bodies have met simultaneously, neither of them has been compelled to give way to enable the others to act. Neither is there any difficulty about his office files. The law never required him to have his office either in or near the court-room, and our present legislation indicates a purpose to have the county offices built more solidly and safely than court-houses are usually, and expressly discriminates between the buildings. Pub. Acts 1877, p. 50. There is still less force in the argument as applied to the sheriff, for his duties are almost entirely outside of his office, and call him to all parts of the county.

The only question that requires attention is that relating to the supposed fixed location of circuit courts as ancient and inseparable adjuncts to county seats, which by their name are said to be seats of justice. And it is claimed that

when, as in the case of circuit courts, the law requires them to hold sittings in a county, the county seat, by not having them, is deprived of its essential quality and ceases to fulfil its necessary functions. And stress is laid on the fact, which is not denied, that our early legislation frequently, and perhaps generally, called them "seats of justice."

This argument is quite as forcible from the same ancient common-law analogies in favor of the seat of government within the same county. Our Constitution calls Lansing the "seat of government," and by the practice and theory of England and most other commonwealths, all departments of the government, of which the judicial department is co-ordinate in importance with the rest, are usually represented at its central seat. There are very strong reasons of general convenience in favor of having a tribunal of original jurisdiction at that point. It has been uniformly held in this State that the circuit courts are in no sense county agencies or instrumentalities. There are very few cases in which the county in its own right is even interested in litigation. On the other hand, the State has required special legislation to enable it to resort to this very circuit court not only as a forum of litigation, but also to review some action by State officers of an administrative and not judicial character. It has never been supposed that the Legislature was bound to put the sessions of the Ingham circuit court at Lansing, but we are somewhat at a loss to see why the implications in favor of permitting it are not as strong as those in favor of the county seat, if the grounds urged are valid at all.

The courts at Westminster, sitting in bank, had original jurisdiction, and were entirely independent of county considerations in their localization. And yet when it became necessary to summon juries from the proper venue, the courts did not seek the county, but the juries were brought up to the court, and its position at Westminster was considered as essential to the general theory of justice. The great charter itself protected this fixed position of the great courts. Their original jurisdiction was like that of our circuits.

It is natural to infer that at least the primary meaning of the terms "county seat" and "seat of government" is alike, in referring to the place where the respective county and State business must have locality in order to be carried on at all, and must, for the convenience of the public and the corporate body, be brought together. The county has a direct agency and control over many subjects, and the county officers perform very important functions. The board of supervisors are to the county what the Legislature is to the State, with administrative as well as legislative duties. The taxes are laid and collected through county machinery; moneys are raised and accounts liquidated, not only for county business, but to meet the county liability in court expenses and incidentals, laid on the county by the State. Deeds and land titles are recorded, and many other private documents are kept there for security and for general information. The county has as well-defined individuality, and as much need of local offices, as a city, or as the State at its capital. There can be no question about the immediate interest of the county in all these things, and the place where they are managed is properly the county seat, and can be nothing else.

To hold that the sitting of courts there is as necessary an incident, and their removal a destruction of its vital existence, must involve the recognition and perpetuation of what depends on inference. And relator has undertaken to establish this inferential necessity. And this is entirely based on what is claimed to be its incorporation into the fabric of our inherited and continued institutions.

It is not beyond the power of the people, in making constitutions, to reject what is not essential to republican government. It can hardly be claimed that the system of counties, however old and valuable, might not be replaced entirely, or essentially modified. An American county does not much resemble an English county; and a Michigan county differs in many things from counties elsewhere. And it strikes one forcibly, in reading our own Constitution, that when it requires several things to be done in

counties, and expressly requires some of them to be done at the county seat, the natural inference is that those not specified may be left to legislative discretion. That is the rule generally applied, and it must be applied here, unless there is such an organic connection between the circuit courts and the county seat as renders their separation mutually destructive, or at least perilous, to our system. As the argument is presented, it assumes that the presence of the court is as much an incident as the general quality of an office perpetuated in the Constitution is to that office.

It is true that we have long had courts meeting at county seats, and that our laws have generally required it in terms. But the fact of such legislation removes much of the force of the argument derived from usage. That which rests on law can be abrogated by law, and can hardly be treated as a recognition of perpetual obligation. But in looking over the history of our institutions it will appear that while the county has from great antiquity been respected as an important factor and locality in judicial matters, the superior sanctity of one place over another in the county is not so obvious. When the county first appears as the seat of justice, the county court was the court of general original jurisdiction, and therefore the most important court to the people. But that county court was purely a county institution, in which the county freeholders were judges of law and fact, and the sheriff a mere presiding officer. Com. Dig. "County" (C 2.) That court had a local habitation in the county in most cases, but there is much reason to believe it was the episcopal city, and not any mere county locality which fixed it.

It is claimed, and probably with truth, that when the king's judges executed their commissions in the county there was still a shire-town generally resorted to for judicial purposes. But there seems to be no foundation for the claim that this was ever deemed essential. The English respect for places having old associations would naturally lead to some uniformity, and the existence of commodious buildings would also be attractive. But, while the general usage

was to resort to these so-called chief towns, it is certain that this was not universal. Reliable authority declares that the county court itself might be held anywhere in the county, unless fixed by statute. Com. Dig. "County" (C 4). The form of the commission of oyer and terminer, found in Fitzherbert, authorizes the judges to appoint the place of sitting. F. N. B. 110b. Mr. Tomlyn (vide "Assize") says there are several statutes as to holding the assizes in different places in certain counties. Power was given in very early statutes to change the usual places of holding assizes by consent of the chancellor and judges. Com. Dig. "Assise" (B 23.) The present English statutes give power to hold them wherever the judges choose to appoint. 2 & 3 Vict. c. 72; Har. Dig. "Jurisdiction of Courts."

We can hardly be justified in finding any constitutional claim to immunity for county seats on English usage so varied and uncertain as this. It is certain that in some large counties, as in York, the Three Ridings were frequently, as they are now, distinct judicial seats, and other counties had different court towns, either fixed or varied. There are many American counties with more than one seat of justice. But our own history is no more settled on this matter than that of some other places. During the period after the Revolution, when Michigan was still held by Great Britain, the country west of Lower Canada was divided into districts for judicial purposes, as is well known, and Detroit was the place of holding court in the district of Hesse, afterwards the Western District. During the same period counties were also laid out, and Detroit was in one of those counties. But at no time were the counties put to any judicial use. They were election and military divisions, but it is not known that at that time they had any other purpose, and their existence has been somewhat obscure. After Michigan was made a separate territory, it was again divided into districts, one containing Detroit, one Michilimackinac, and others different parts of the territory. Courts had been held by the British authorities reg-

ularly at Detroit and Michilimackinac. But in the Act which provided for district courts, Detroit was the only place named, and in the other districts the marshal was allowed to select the court town. 1 Terr. L. 17.

It has also been usual for the Legislature to make provision not only for temporary seats of justice away from the county seat, but to allow changes in case of supposed necessity to be determined, not by the executive or judiciary, but by the ministerial officers of the court. This was fully illustrated on the argument.

If the usage has been, as it seems to have been, so largely open to variation, the only conclusion seems to be that, while it is deserving of great respect and ought not to be slighted, it cannot properly be regarded as having been deemed beyond legislative interference, or as essentially a part of the local existence of the county seat. It is not, therefore, so sacred a heritage as to be entitled to any implied protection under the Constitution.

I do not think the law invalid.

The other Justices concurred.