WILLIAM L. R. A. ANDRES v. DAN J. ARNOLD, JUDGE
OF THE CIRCUIT COURT FOR OTTAWA COUNTY.

*Elections—Naturalization laws—Declaration of intention.*

1. Declarations of intention are not required to be made before the clerk of a court in his office or in open court.

2. The following propositions are summarized from the opinion of Mr. Justice CAMPBELL:

*a*—The fact that this or any other state may extend privileges to aliens, who have merely declared their intention to become citizens, can have no weight in determining how such declarations are to be made.

*b*—A declaration on oath of an intention to become a citizen in no way differs in its nature from any other oath or affidavit, and in the very many cases of such oaths, whether before judges, justices, notaries, commissioners, or clerks, the only inquiry recognized is whether the oath is administered within the officer's jurisdiction, and not in what particular building or place it may be administered; and, unless there is some statutory intimation to the contrary, there is no reason why this case should form an exception.

*c*—The history and construction of the naturalization laws show that this declaration confers no privileges, and fixes no rights, and is not jurisdictional, but is in several cases dispensed with. The United States Supreme. Court has repeatedly held that no inquiry can be made in any controversy to attack the sufficiency of the final admission to citizenship, by showing a want of conformity to the previous requirements of the statutes.

*d*—If the declaration of intention was a proceeding on which witnesses were sworn or inquiries made, there would be, perhaps, some reason for formality. But it is a purely *ex parte* oath, which in no way dispenses with the inquiry made on final admission, and which Congress has not made of any particular value. The final application is not required to be made to the same court, or within the same jurisdiction, where the original declaration is made; and the inquiries made at the time of admission need not, and generally cannot, go into the *minutiæ* or circumstances of such declaration of intention, and are complete in themselves.

*e*—The fact that our laws give more force to these declarations than Congress has done cannot have any weight in construing congressional action, which must speak for itself, and lay down its own conditions.

*Mandamus.* Submitted April 12, 1889. Denied October 25, 1889.

Relator applies for *mandamus* to compel respondent to allow an information in the nature of a *quo warranto* to be filed in the circuit court for Ottawa county. The facts are stated in the opinion.

*Godwin, Adsit & Dunham,* for relator.

*George A. Farr,* for respondent.

CAMPBELL, J.   The only serious question involved in the inquiry which relator seeks to make concerning the validity of the declared result of the election in this case is whether declarations of intention can be made before a clerk of a court anywhere but in his office, or in open court.   If those declarations were valid, the other questions need not be considered, whether relating to the remedy or otherwise.

The statutes of the United States are all that we can be governed by, inasmuch as Congress has exclusive power over naturalization.   The fact that this or any other state may extend privileges to aliens, who have merely declared their intention to become citizens, can have no weight in determining how such declarations are to be made.

The amendment of 1876 to the Revised Statutes of the United States (section 2165) is made to qualify a section that had required such declarations to be made before a court of record.   It declares that not only for the future, but also for the past, such declarations "before the clerk" of any of such courts shall be as legal and valid as if made before the court.

This language, in its natural sense, makes the person before whom the declaration is made, and only the person, material.   A declaration on oath for this purpose in no way differs in its nature from any other oath or affidavit, and in the very many cases of such oaths, whether before judges, justices, notaries, commissioners, or clerks, the only inquiry recognized is whether the oath is administered within the officer's jurisdiction, and not in what particular building or place it may be administered; and, unless there is some statutory intimation to the con-

trary, there is no reason why this case should form an exception. On the contrary, the history and construction of the naturalization laws show that this declaration confers no privileges, and fixes no rights, and is not jurisdictional, but is in several cases dispensed with. The United States Supreme Court has repeatedly held that no inquiry can be made in any controversy to attack the sufficiency of the final admission to citizenship by showing a want of conformity to the previous requirements of the statutes. *Campbell v. Gordon*, 6 Cranch, 176; *Stark v. Insurance Co.*, 7 Id. 420; *Spratt v. Spratt*, 4 Pet. 393.

The naturalization laws originally required no preliminary declaration, but allowed citizenship on two years' residence. 1 U. S. Stat. 103. In 1795 the rule now generally in force was established, requiring a declaration in advance three years (and not two, as now required), but fixing five years' residence as necessary for admission. Id. 414. By that law, as by all subsequent ones, the declaration of intention was merely on the *ex parte* oath of the applicant, and no inquiry was made in any formal way until he applied for his last papers, when evidence was taken, and the facts looked into. The alien law of 1798, which covers other matters than naturalization, contained some stringent provisions, and required a declaration five years before admission and fourteen years' residence, saving, however, cases of aliens residing here before the law was passed. In 1802 the old rule was restored. 2 U. S. Stat. 153. In 1804 declarations of intention were dispensed with in all cases where residence dated back of the law of 1802, and only final papers required in such cases. Id. 292.

In 1824, it having been found that the law had been carelessly administered, instead of adopting more stringent rules the door was opened still wider. It was provided that declarations of intention might be made two years,

instead of three, before admission. It was also provided that minors residing three years during minority need not make any declaration; that declarations theretofore as well as thereafter made before clerks, instead of courts, should be valid; and that final admission, made without any declaration at all, should not be invalid. 4 U. S. Stat. 69. On page 310 of the same volume is a law exempting persons coming into the country between 1802 and 1812 from making such declarations. In 1848 the old law requiring not only residence, but unbroken continuance in the country, was repealed. 9 U. S. Stat. 240.

This was the state of the law, subject to some further dispensation concerning declarations of intention, and some shortening of residence in particular cases, when the Revised Statutes of 1872 were adopted. It is well known that the compilers of that revision, which was not meant to change the laws, were no more exempt from mistakes than others, and numerous amendments have been required to place the law where they should have found it. That revision, while it retained the several exemptions from declaration of intention which had been brought in from time to time, did not embody the change of 1824, which validated and authorized clerks to take the first declaration. In 1876 this portion was restored, and is now in force.

If the declaration of intention was a proceeding on which witnesses were sworn or inquiries made, there would be, perhaps, some reason for formality. But it is a purely *ex parte* oath, which in no way dispenses with the inquiry made on final admission, and which Congress has not made of any particular value. It is difficult to see for what purpose it was devised, unless possibly as a reminder that a man should not become a citizen without two years' deliberation. Even this is dispensed with in quite a number of instances; and when Congress, by the

act of 1824, adopted its present policy, it was evidently for the reason that the declaration was not deemed of any special importance. The final application is not required to be made to the same court, or within the same jurisdiction, where the original declaration is made; and the inquiries made at the time of his admission need not, and generally cannot, go into the *minutiæ* or circumstances of his declaration of intention, and are complete in themselves.

There is no substantial reason why a clerk must be in his office or in court for this purpose, any more than for any other ministerial act not pertaining to court business. There is no law requiring him to be in any particular place to administer affidavits. As shown in *Whallon v. Judge*, 51 Mich. 503 (16 N. W. Rep. 876), the clerk's movements are not fixed within any one room or set of rooms, or any one place. By our Constitution, until amended, the county clerk was clerk of both circuit and supreme courts held in his county, though not held in the same building, or in the same town. He is clerk *ex officio* of more or less other bodies, and may or must have different places of action, either of which is his official place. There is no reason why an oath may not be taken before him at any place where he happens to be, as well as before a judge, or justice, or notary, or commissioner. He is the person indicated by the law. When it dispenses with his action in open court, it dispenses with the only locality which is universally known for clerical action; and we cannot require his action under the naturalization laws to be had in any particular spot or room or building without adding to the law a qualification of our own not indicated by its language, and not required by any of its purposes.

The fact that our laws give more force to these declarations than Congress has done cannot have any weight

in construing congressional action. That must speak for itself, and lay down its own conditions.

The writ should be denied.

SHERWOOD, C. J., CHAMPLIN and LONG, JJ., concurred with CAMPBELL, J.

MORSE, J., *(dissenting)*. I cannot agree with the conclusion reached by my brethren in this case.

The naturalization laws which govern the method of procedure in transforming an alien into a citizen of the United States, are the acts of the Congress of the United States, which is given exclusive jurisdiction over the subject of naturalization. By the act of Congress of May 26, 1824, aliens were permitted to declare their intentions to become citizens of the United States, before "the clerk" of any court of record, and such clerks were authorized to take such declarations. 4 U. S. Stat. 69. This provision was changed by the revision of the laws by Congress of 1873–74, which required the declaration to be made in open court. Rev. Stat. U. S. 1873–74, § 2165. By an act of Congress approved February 1, 1876, it was again enacted that—

"The declaration of intention to become a citizen of the United States    *    *    *    may be made by an alien before *the clerk* of any of the courts named," etc.

It was further enacted that—

"All such declarations heretofore made before any such clerk are hereby declared as legal and valid as if made before one of the courts named in said section." 19 U. S. Stat. 2.

The proceeding is necessarily one of record, as no officer but the clerk of a court of record is authorized to take the declarations. The making of this declaration of intention is the first step in the proceeding to become a citizen. And he cannot be clothed with full citizenship,

except by the action of a court of record in open court.

The court wherein the proceedings were commenced, in the case of the persons voting in Ottawa county last fall, and claimed by the relator not to be voters, was the circuit court for the county of Ottawa, which court must be holden at the county seat, Grand Haven; and there and nowhere else must be the office of the clerk of said court. There is kept the seal of the court. It is claimed by the counsel for the relator that the county clerk of Ottawa county, who, by virtue of such office, is clerk of said circuit court, cannot act as clerk of the circuit court for the county of Ottawa except in his office at Grand Haven, or in open court. That outside of his office,—

"Of the places where his official duties are authorized to be performed, he is simply a citizen, and no more; simply the person who is designated by law to perform the duties of *clerk of the court* at the proper time and place."

It is also urged that when an alien declares his intention to become a citizen he is entitled to a certificate, a certified copy of such declaration, duly attested by the clerk and the seal of the court; that this could not be done at places away from the office and the city of Grand Haven, as the clerk has no authority to go about the county carrying the seal of the court with him. It is therefore contended that proceedings to become a citizen could not be commenced by a declaration of intention made, for instance, at Jamestown, 20 or 30 miles from the county seat, or at any other place than the office of the clerk of the circuit court. There seems to be no limit to the number of deputies the clerk may appoint, and there might be, if this method is lawful, a deputy in each township in the county on the same day taking these declarations. In such case the opportunities for

fraud would also seem to be limitless. The declarations in these cases—81 of them—were commenced, as shown by the records,—

"In the circuit court for the county of Ottawa, at Holland, on the 30th day of April, 1888, before one Chas. T. Pagelson, deputy-clerk."

On April 27, 1888, 73 were made before said Pagelson, at Zeeland; and on May 3, 1888, 30 were made before "Chas. E. Soule, deputy-clerk," at Polkton and Tallmadge. It is shown that each of these persons, except those who made their declarations before Soule, signed his declaration on the record-book of the court. The record-book was taken from the clerk's office, and carried around the county for that purpose. Soule took the declarations before him on blanks, which declarations were afterwards copied upon the record-book. While this book was out of the clerk's office it is claimed that declarations were taken on blanks in the clerk's office. This is certainly a loose way of doing business. The question arises, is it a legal method?

I think the objection made to the taking of these declarations by a deputy-clerk is not well founded. In this State deputy-clerks may perform the duties of the clerk. How. Stat. § 573; *Calender v. Olcott*, 1 Mich. 344; *Dorr v. Clark*, 7 Id. 310. But I think no man can legally declare his intention to become a citizen of the United States outside of the clerk's office, unless it is in open court.

We have on record what the views of one Justice of the Supreme Court of the United States are as to the practice prevailing in Ottawa county.

On June 28, 1887, Emilie Charlotte Langtry, a subject of the Queen of Great Britain, made application to become a citizen of the United States, and a bound volume of declarations by aliens, in which some of the blanks

had not been used, was taken from the clerk's office of the United States circuit court for the district of California, at San Francisco, by a deputy-clerk, and carried to the private residence of Mrs. Langtry, and there her declaration was made and oath taken by the deputy-clerk. This fact coming to the knowledge of Mr. Justice Field, of the Supreme Court of the United States, then holding with Circuit Judge Sawyer the circuit court at San Francisco, the attention of Mr. Barnes, the counsel for Mrs. Langtry, was called by Mr. Justice Field to the manner of taking of her declaration, and he was advised that the court had doubts of the legality of her declaration. Mr. Justice Field said:

"He did not think that the statutes furnished any authority for the clerk of the court to take a declaration of one to become a citizen out of his (the clerk's) office, except in open court, and for that purpose to carry the records of the court to the private residence of the party. To permit the proceeding to pass without comment would be to establish a dangerous precedent, and one calculated to give rise to gross abuses. The Justice observed that to be an American citizen was a great privilege; that citizenship should be regarded as a sacred trust; and that persons seeking to take upon themselves its responsibilities ought to consider it of sufficient value to attend where the records of the court are held in proper legal custody. In some states a man is allowed to vote as soon as he makes his declaration of intention to become a citizen; and if the clerk of the court, or his deputy, can go around the country taking declarations of intention and administering oaths, it is evident that dangerous consequences might follow, especially as there is no limit to the number of deputies which a clerk may appoint." See *In re Langtry*, 31 Fed. Rep. 879, 880.

The record in this case shows that it has been the custom for some years in Ottawa county to naturalize people in this way, and it is contended that such custom has almost, if not quite, ripened into law. But the fact that an unlawful custom has prevailed for even 30 years can-

not change the naturalization laws of the United States, nor is it a good reason for continuing a bad practice.

The record in this case also shows on the part of the relator, and is substantially admitted in the affidavits attached to the showing of the respondent, that about seven months before the general election a number of deputies were appointed by the county clerk of Ottawa county for the sole purpose of going about the county, with the necessary blanks or court records, to hunt up persons who were aliens, and to take their declarations of intention to become citizens. This was also manifestly, if the relator's showing be true, to make voters who otherwise would not have become so, men who, if left to their own motion, would never take any steps to become citizens.

It is a matter of common notoriety that all over the land these men, aliens, are waited upon by partisan committees, and their naturalization fees paid out of party funds in order to make them voters. And some of these persons have so little desire of their own to become citizens that they never go any further than the declaration of their intention. The man who is worthy to become a citizen of the United States, and to share in the privileges of the government, to take part in the making of its laws, and who in good faith desires to do so, will find ways and means of his own to declare his intention, and to take all necessary steps to be clothed in time with full citizenship. It is not necessary, nor is it desirable, that about six months before election the political partisan should be scouring the county, going into every highway and alley, for aliens, who, if the expense is paid, will become voters and recruits in his party. Here lies the great incentive to fraud, and the easy opportunity for it. If the alien must himself go to the office of the clerk of the court, and pay the expenses of his own advancement

to citizenship, fraud in declarations of intention to become a citizen will seldom occur; and the citizen, thus acquired, will be in the future, as in the past, a welcome and desirable addition to our voting population.    If our naturalization laws had been rigidly enforced in the past, our large cities would not have been cursed, as some of them now are, with a large number of voters who openly avow that the only object they have in casting the ballot is to destroy not only our government, but all government and all law, that anarchy may reign in its stead.

I do not believe in this kind of business of carrying the records and books of the courts from town to town, and from place to place, to manufacture voters, or even to accommodate an alien, who considers the privilege of American citizenship of too little value to seek it at the county seat or at the court-room.    And, in my opinion, it is neither required by good policy, nor sanctioned by the law.    On the contrary, as I have shown, we have the highest judicial condemnation of it.

I think the writ should issue.