STATE EX REL. GEIGER, RELATOR, *v.* LONG, RESPONDENT.

. (No. 2,992.)

(Submitted April 3, 1911.   Decided April 22, 1911.)

[117 Pac. 104.]

*County   Seats—Fixing   Permanent   Location—Special   Laws— New Counties—Power of Legislature—Lincoln County Act— Constitutionality.*

New Counties—County Seats—Legislature—Implied Powers.
  1.   The legislature having the power to create new counties by special Act (*Holliday* v. *Sweet Grass County,* 19 Mont. 364, 48 Pac. 553), authority to do all things incidental to a complete exercise of such power is implied.
Same—County Seats—Permanent Location—Modes Permissible.
  2.   One of the powers necessarily incidental to the complete creation of a new county is that of designating a county seat, which power may be exercised by locating a permanent county seat in the Act creating the county, or by naming a temporary or provisional place and leaving the question of the permanent location of the seat of government to the people of the county for decision.  (See opinion on rehearing, *post,* p. 415.
Same—"Changing" and "Removing" County Seats.
  3.   The words "changing" and "removing" found in the Constitution and the statute laws having to do with county seats, refer to the act of changing or removing a county seat which has been definitely located, and not to a temporary or provisional one.
Lincoln County—Permanent County Seat—Location—Constitutionality of Act.
  4.   *Held,* that that portion of the Act creating Lincoln county (Laws of 1909, Chapter 133) providing, after designating the town of Libby as the county seat, that the people of said county should definitely fix the county seat by means of an election, was not unconstitutional as conflicting with the provision of section 26, Article V, of the Constitution, that "the legislative assembly shall not pass local or special laws   *  *  *   locating or changing county seats."   (For holding *contra,* see opinion on rehearing, *post,* p. 415.)

Original application for *mandamus* by the state, on the relation of John H. Geiger, against Philip R. Long, as clerk of the district court of Lincoln county. Demurrer and motion to quash sustained, and proceedings dismissed.

*Mr. Wm. T. Pigott, Messrs. Wight & Pew, Mr. G. H. Grubb,* and *Mr. Sidney Logan* submitted a brief in behalf of Relator. *Messrs. Wight, Pew* and *Grubb* argued the cause orally.

An ancient and universally approved maxim is that contemporaneous interpretation, or construction, or exposition of constitutions or statutes, whether by the court or by the framers of the Constitution, or by the law-making power, or by the officers charged with the execution of that instrument, of any enactments which are based thereon, or by the silent, but none the less effective, tacit consent and approval of the people, is the best and strongest evidence and proof of what the provisions, constitutional or statutory, were intended to mean. (*The Laura,* 114 U. S. 411, 414, 416, 5 Sup. Ct. 881, 29 L. Ed. 147.) So in the proceeding at bar, the practical interpretation by the framers of the Constitution, by the legislative assembly, by governors, by executive and ministerial officers, by judges, and by all the people, for nearly a quarter of a century, coupled with the fact that this interpretation was made by many of the same men who were members of the constitutional convention, and sat in subsequent legislatures, makes an end of respondent's contention; and is likewise in perfect harmony with the decision of this court in *Holliday* v. *Sweet Grass Co.,* 19 Mont. 367, 48 Pac. 553; *Sackett* v. *Thomas,* 25 Mont. 226, 64 Pac. 503; *State* v. *Mayhew,* 21 Mont. 93, 52 Pac. 981; see, also, *Doan* v. *Logan Co.,* 2 Idaho, 781, 26 Pac. 167, and *Attorney General* v. *Iron Co.,* 64 Mich. 607, 31 N. W. 539; *Territory* v. *County of Mohave,* 2 Ariz. 248, 12 Pac. 730.

Respondent insists that the legislative assembly has power, in creating a county, to designate the temporary or provisional county seat, but that it is beyond its competency in the same Act of creation, to make provision whereby the people may, at the next general election, themselves express their preference

for the place at and from which their own local affairs shall be carried on and administered. He seems to contend that the legislative assembly exhausts its power when it names the temporary county seat, and that it can never thereafter permit the removal of the seat of government to another place, until and unless there be a general law, applicable to all the counties of the state, authorizing the people to make such change at an election, which would, according to his own contention, be the location by the legislative assembly of a county seat by a special Act, this result being brought about by the inaction of the legislature to pass any general law, under which this temporary—provisional—permanently fixed county seat can be "located"; in other words, that the county seat selected by the legislative assembly as the temporary or provisional county seat cannot be changed by pursuing *any* provision which *can* be incorporated into the Act of the creation, but that such temporary county seat becomes at once the permanent county seat. The county seat cannot be temporary and provisional, and, at the same moment of time, permanent and lasting. It might as well be said of a judge *pro tempore* that he is not only a *locum tenens,* but the regular and permanent judge, or of an officer that he is such *de facto* and *de jure.* We venture respectfully to suggest that an officer cannot be, at one and the same time, provisional and permanent. and that a county seat cannot be, at one and the same time, temporary and provisional, and fixed and permanent. This would be a contradiction, not only in terms, in form, and in language, but in actuality.

There is no provision of the Constitution prohibiting the legislature from creating counties of the state, and by section 1 of Article XVI it has the power by express grant. There being no such constitutional prohibition, the rule is universal that the legislature has that power. If the power to create a county is present in the legislature, there must inevitably and logically follow the power to do everything that may be necessary or proper to be done in the full and complete creation of the county, so that the creation itself—the county—may be a complete entity, with nothing lacking, and ready to take its place amongst

the counties of the state, as a completed whole, a political, governmental, subdivision of the state. All the counties must have county seats—a place to hold court, a place for officers to perform the county's business—and if this thing is lacking, it is not a completed whole. (See *Holliday* v. *Sweet Grass County,* 19 Mont. 364, 48 Pac. 553.)

While the legislature itself might have provided that the county seat of Lincoln county should be at the town of Libby temporarily, and at the town of Eureka permanently, yet it had the power to delegate the determination of the establishment of the county seat to the qualified electors of the county. The courts have universally held that, where the legislature had power to do an act itself, that power might be delegated to the people. (*State* v. *Commissioners,* 24 Fla. 263, 4 South. 796; *Upham* v. *Sutter Co.,* 8 Cal. 383.)

The constitutional prohibition against the locating or changing of county seats by local or special laws was intended to apply only to counties after they had been fully created. (See *Doan* v. *Commissioners,* 2 Idaho, 781, 26 Pac. 167; *Attorney General* v. *Iron County,* 64 Mich. 607, 31 S. W. 539; *People* v. *Glenn,* 100 Cal. 419, 38 Am. St. Rep. 305, 35 Pac. 302; *People* v. *County of Orange,* 81 Cal. 489, 15 Am. St. Rep. 66, 22 Pac. 851.)

*Messrs. Gunn & Hall,* and *Mr. John W. Stanton,* for Respondent, submitted a brief in support of demurrer and motion to quash. *Mr. M. S. Gunn* argued the cause orally.

It is our contention that the provisions of section 3 of the Act in question, to the extent that they provide for holding an election to determine the location of the permanent county seat of Lincoln county, are in violation of section 26, of Article V, of the Constitution of Montana. That this law is both local and special, and has for its purpose the location of the county seat of Lincoln county, is a proposition which does not admit of controversy. (*Sackett* v. *Thomas,* 25 Mont. 226, 64 Pac. 503.) Many of the states have constitutional provisions prohibiting special and local laws changing or locating county seats, and in every instance where the question of the constitutionality of a

law providing for an election to determine the location of a
county seat in a particular county has been presented in states
having such constitutional provisions, it has been held that such
a law is invalid. (See *Groves* v. *County Court,* 42 W. Va. 587,
26 S. E. 460; *Presidio County* v. *Jeff Davis County* (Tex. Civ.
App.), 77 S. W. 278; *Ex parte Connolly,* 17 N. D. 546, 117 N. W.
946; *Adams* v. *Smith,* 6 Dak. 94, 50 N. W. 720; *Nichols* v. *Walter,* 37 Minn. 264, 33 N. W. 800.)

The Constitution does not prohibit the creation of a county
by special Act. (*State* v. *Mayhew,* 21 Mont. 93, 52 Pac. 981.)
It is undoubtedly within the power of the legislative assembly,
in providing for the creation and organization of a county, to
designate a place as the temporary county seat. (*Holliday* v.
*Sweet Grass County,* 19 Mont. 364, 48 Pac. 553; *Sackett* v.
*Thomas, supra;* 11 Cyc. 367; *Rice* v. *Shay,* 43 Mich. 380, 5 N. W.
435; *Attorney General* v. *Board of County Canvassers,* 64 Mich.
607, 31 N. W. 539.) Notwithstanding the provision of section
26, Article V of the Constitution, that the legislative assembly
shall not pass local or special laws creating county offices, etc.,
it clearly has the power, as incidental to the creation of a new
county, to designate the county officers. This power is "necessarily incidental to the creation of a new county." For the
same reason a temporary county seat may be designated.
Section 6 of Article XIX provides that all county officers shall
keep their offices at the county seats of their respective counties.
This provision clearly contemplates that the legislative assembly,
in the exercise of its power to create a new county and provide for
its organization, shall designate a temporary county seat. A
temporary seat is as essential to the organization of a new
county and the operation of the governmental machinery therein,
as the designation of county officers. It is essential to the
validity of a judgment that the court rendering the same should
be held at the time and place designated by law. (Black on
Judgments, sec. 177.) It follows that the designation of a temporary county seat is absolutely essential to the creation and
organization of a county.

On the argument relator cited the case of *Doan* v. *Board of County Commissioners,* 2 Idaho, 781, 26 Pac. 167, and the case of *Attorney General* v. *Board of County Canvassers,* 64 Mich. 607, 31 N. W. 539, in support of the contention that, the law in question is constitutional. It is true that in each of those cases the courts sustained the validity of a special and local law providing for an election to determine the location of a permanent county seat. In neither of the states, however, is there a constitutional provision prohibiting the passage of local and special laws locating or changing county seats, but in each of these states there is a constitutional provision similar to section 2 of Article XVI of our Constitution, providing that the law-making body shall not have the power to remove a county seat, but may provide for such removal by general law. It was held and decided in those cases that until a county seat has been permanently located, the provision of the Constitution with reference to removal has no application. The court said that the permanent location of a county seat at a different place from that designated in the law creating the county as the temporary seat is not a removal within the meaning of the constitutional provision. To the same effect is the case of *County Commissioners* v. *State,* 27 Fla. 263, 4 South. 795. The cases of *Doan* v. *Commissioners* and *Attorney General* v. *Board of County Canvassers* are authorities to the effect that the designation of a temporary county seat is not the establishment or location of a county seat, and that section 2 of Article XVI of the Constitution of Montana, which provides that "the legislative assembly shall have no power to remove the county seat, but the same shall be provided for by general law," is only operative after a county seat has been permanently located.

In view of the fact that section 2 of Article XVI of the Constitution prohibits the removal of a county seat by special law, section 26 of Article V, prohibiting local or special laws "locating or changing county seats," cannot apply to a county seat which has been permanently located, and can only apply to new counties where the county seat has not been permanently located.

The following states have constitutional provisions prohibiting local and special legislation "locating or changing county seats": Illinois, Article IV, section 22; Missouri, Article IV, section 53; Wisconsin, Article IV, section 31; North Dakota, Article II, section 69; Wyoming, Article III, section 56; South Dakota, Article III, section 23; Nebraska, Article III, section 15; Colorado, Article V, section 25. All of the above states have general laws providing for the location of county seats.

MR. JUSTICE SMITH delivered the opinion of the court.

By an Act entitled "An Act to create the county of Lincoln, designate its boundaries and provide for its organization and government," being Chapter 133 of the Laws of 1909, the legislative assembly erected a certain portion of Flathead county into the county of Lincoln. Section 3 of the Act reads as follows:

"That the town of Libby, situate within the boundaries above mentioned, shall be the county seat of said county of Lincoln, until the county seat of said county shall be designated as hereinafter provided. And for the purpose of definitely fixing and creating the county seat of the county hereby created, the board of county commissioners of Lincoln county shall cause to be inserted in the official ballots, when printed for the general election held the first Tuesday after the first Monday in November A. D. 1910, at the foot of the names of the candidates, or nominees thereon, the following: 'For the county seat of Lincoln county ———,' and the electors, when voting at the said general election at the time hereinbefore mentioned shall declare their vote upon said proposition by inserting in the blank space upon their ballots herein provided for, the name of some one town within said county of Lincoln, and when the name of a town shall be so inserted in the space by an elector, and the ballots have been cast as provided by law, the name shall be deemed a vote for the designated town as the place of the permanent county seat of Lincoln county, and upon a canvass of the said ballots the town having the highest number of ballots shall be declared by the canvassing board the county seat of Lincoln

county, which result shall be entered in the office of the county clerk and recorder of said Lincoln county, and from the date of such declaration of result, the town selected shall be and remain, until lawfully changed, the county seat of Lincoln county. All laws of a general nature applicable to the several counties of the state of Montana, and the officers thereof, shall be made applicable to said county of Lincoln, and the officers who may hereafter be elected, or appointed, therein, except as otherwise provided in this Act.''

At the general election held in November, 1910, the town of Eureka received 653 votes for the county seat, and the town of Libby received 638 votes; and thereupon the board of county commissioners, sitting as a board of canvassers, found and declared that the town of Eureka was the permanent county seat of Lincoln county. The respondent, who is the clerk of the district court of the county, refused to remove his office from Libby to Eureka and this proceeding in *mandamus* was instituted to compel him to do so. He has filed a motion to quash an alternative writ heretofore issued, and also a general demurrer to relator's affidavit for the writ, and the matter has been submitted for final decision.

It is contended that that portion of the Act providing for an election to determine the location of the permanent county seat is unconstitutional, for the reason that it conflicts in its provisions with section 26 of Article V of the Constitution. That section, in so far as it is invoked, reads thus: ''The legislative assembly shall not pass local or special laws  *   *   *   locating or changing county seats.'' It is said that that portion of the Act providing for an election is both local and special in its provisions, and we could readily agree with the conclusion, if the provisions referred to related to a county seat already located or to a county fully created. As will hereafter be shown, however, being a part of the Act creating the county, they cannot be regarded as local or special within the meaning of those terms as employed in the Constitution, if it be admitted that the legislative assembly has the power to create a county by special Act. In the case of *Holliday* v. *Sweet Grass County,* 19 Mont. 364,

48 Pac. 553, this court, through Mr. Justice Buck, said: "Creating a new county by a special Act is not forbidden by the state Constitution, and matters necessarily incidental to the creation of a new county, which are provided for in the Act creating it, solely for the purpose of organizing the new county and setting it in motion as one of the governmental subdivisions of the state, do not come within either the letter or the spirit of the inhibitions of section 26, Article V, of the Constitution." In the case of *State ex rel. Sackett* v. *Thomas,* 25 Mont. 226, 64 Pac. 503, this court again recognized the power of the legislative assembly to create a county by special Act, in the following language: "The Constitution recognizes the power of the legislature to create new counties, to change those already established, and to alter their boundaries,  *  *  *  and this power has been heretofore exercised in many instances. It has been recognized and affirmed by this court, in *Holliday* v. *Sweet Grass County,* where a special Act creating the defendant county was upheld; and this power to create necessarily implies the power to destroy; so that, in the exercise of it, the legislature may abolish a county organization, and incorporate its territory within another county. It may also at the same time exercise any other power incidental to a complete exercise of the principal one; but this power does not necessarily carry with it the right to interfere by special enactment in the internal affairs of the county, even though a majority of the people do not object. The whole spirit of the Constitution is opposed to this species of interference, and it seems clear to us that the prohibition in question was designed to prevent just such interference as has been attempted in the present instance [changing the name of a county already created]. The power to create counties and give them names, or to destroy them, is unquestioned; but after they are created they may not be disturbed by special or local legislation, except incidentally, in the exercise of the creative power, or in cases where a general law cannot be made applicable." (See, also, *State ex rel. Williams* v. *Mayhew,* 21 Mont. 93, 52 Pac. 981.)

It will be noted that the assertion in *Sackett* v. *Thomas,* to the effect that the legislature has the undoubted right to create new

counties by special Act, is based upon the former decision in *Holliday* v. *Sweet Grass County.* In that case the opinion does not disclose any examination of constitutional provisions or a citation of authorities. The decision, however, is not without authority to uphold it. It might perhaps have been urged that the legislature has no authority to create a new county by special [1]  Act, for the reason that it has no power to locate a county seat, a necessary institution in every county. Nevertheless, it is settled law in this state that the legislature has such power, and that holding ought not to be changed at this time. Until the last session of the legislative assembly (1911), we had no general law providing for the creation of new counties, but notwithstanding this, the legislature has created, since the adoption of the Constitution, the following counties, *viz.:* Flathead, Valley, Teton, Ravalli, Granite, Carbon, Sweet Grass, Broadwater, Powell, Rosebud, Sanders, Lincoln and Musselshell. If we should now hold that the legislature was without power or authority to create these counties, the result would be most disastrous. The legislature has, then, such power. And the possession of this power necessarily implies authority to "exercise every other power incidental to a complete exercise of the principal one." (*State ex rel. Sackett* v. *Thomas, supra.*) One of the necessarily [2]  incidental powers is that of designating a place for the transaction of the business of the county, and this power may be exercised by locating a permanent county seat in the Act creating the county, or by naming a temporary or provisional place for the transaction of business and leaving the question of the permanent location of the county seat to the people of the county for decision. In either case the act of creation is not complete until the county seat is definitely and permanently located. In *State ex rel. Williams* v. *Mayhew, supra,* the question was raised as to the power of the legislature to appoint commissioners for Ravalli county. This court, among other things, said: "We raise no question that, as a general proposition relating to counties in existence, the legislative assembly has no power to elect or appoint county officers by an Act or otherwise. To so hold would be to ignore and do violence to the theory of local self-

government, which is conceded to be the fundamental principle—the corner-stone—supporting our whole system of government. * * * Did the legislative assembly have the power to appoint or name provisionally the county officers of the county, including county commissioners, in and by the Act creating Ravalli county? It is and must be conceded that the legislative assembly has the power to create new counties. * * * But what is meant by creating a county by the legislative assembly? It means more than forming and defining it geographically. * * * It certainly seems that something more than laying out the boundaries and naming the offices is necessary to be done before it can be truthfully said that a county has been created. Such a creature would be a lifeless and useless thing, until inspired with motion and power and means to act in fulfilling the purpose of its creation. When it is said that a county has been created, it is, and ought certainly to be, understood that a municipality has been organized, with power and means to aid the state in administering its political affairs, and promoting the welfare of the people and best interests of the commonwealth. A county cannot be said to be created by the sovereign power, until it is endowed with power and means to aid in these important matters of the state."

The courts have met with no little difficulty in dealing with questions kindred to that which we are considering. While recognizing the principle of local self-government, some courts have placed their decisions on the ground that in creating a municipal subdivision of the state, an emergency arises which must be met by the legislature in order to fully exercise its undoubted sovereign power of creation. They have therefore designated county officers first appointed as temporary or provisional officers, as distinguished from permanent officers, who may only be selected by the people themselves. But it is simply begging the question to say that the legislature has power to name "temporary" officers, but no power to name "permanent" officers. In our judgment, however, the particular designation is immaterial. The fact remains that a so-called temporary officer can hold until the next general election, and while he is in office his status is in no way distinguishable from that of an

elected officer. Such officers are, in fact, permanent (although the expression is paradoxical) until the next general election. After an officer of a new county, named by the legislature, has qualified, he is as firmly fixed in his office as he would be had he been elected, so that, however we may quibble about terms, an officer appointed by the legislature is as nearly permanent in his position as are public officers generally. In his case, however, the Constitution and general election laws intervene and provide for the selection of his successor. Not so with the so-called temporary county seat.

The last legislative assembly passed a general law (House Bill No. 12, approved March 9, 1911) providing "for the designation of temporary county seats and for the location of permanent county seats in new counties or in counties in which the permanent county seat has not been located." Prior to the passage of this measure, there was no general law by which a so-called temporary county seat could be located, changed, or removed. Consequently, if the legislature had exhausted its power in naming one place, even though it was designated as only temporary, it became in fact permanent. While it is argued by respondent's counsel that the act of fixing a county seat at a permanent place (the legislature having designated a temporary place) amounts to "changing" or "removing" the county seat, we are not able to agree with the suggestion. The words [3] "changing" and "removing" found in the Constitution and the statute laws refer to the act of changing or removing a county seat that has been definitely located, and have no reference to a so-called temporary or provisional county seat. (*Doan* v. *Board of Commissioners,* 2 Idaho, 781, 26 Pac. 167; *Attorney General* v. *Board,* 64 Mich. 607, 31 N. W. 539; *County Commissioners* v. *State,* 24 Fla. 263, 4 South. 795.) There is but one logical conclusion from this argument, and that is that a county is not fully created until its county seat has been definitely fixed and located. The legislative authority to create has not been exhausted, and, in fact, has not been exercised, until such time as a county seat shall be definitely located, either by the Act itself, or by operation of the machinery provided in

the Act. The legislative assembly of 1909 did not locate the county seat of Lincoln county, but did provide that the people of that county should select and locate their own county seat. This it had authority to do. (*Territory* v. *Board of Supervisors,* 2 Ariz. 248, 12 Pac. 730; *Rice* v. *Shay,* 43 Mich. 380, 5 N. W. 435; *Upham* v. *Supervisors,* 8 Cal. 379.) The result is that the [4] constitutional scheme of local self-government has not been violated, the people of Lincoln county have selected their own county seat, and the county is now fully created and established as one of the governmental subdivisions of the state.

The motion to quash the alternative writ is denied, the general demurrer to the relator's affidavit is overruled, and it is ordered that a peremptory writ of mandate issue, commanding the respondent to remove his office to the town of Eureka, and there maintain the same.

*Writ granted.*

MR. CHIEF JUSTICE BRANTLY concurs.

MR. JUSTICE HOLLOWAY: I concur in the result reached by MR. JUSTICE SMITH, but again I am forced to acquiesce in a doctrine to which I do not subscribe, solely upon the ground of *stare decisis.*

Since our Constitution was adopted, thirteen new counties have been created, every one by a special Act of the legislature; property rights to the extent of millions of dollars have been acquired; and to reverse the former decisions of this court and hold at this late day that every such Act is unconstitutional and void would result in such chaos that it ought not to be done under the circumstances presented by this record, and under the conditions which now prevail.

In *Holliday* v. *Sweet Grass County,* mentioned above, this court, without any apparent consideration of the question—which does not appear to have been urged—and without the citation of any authority or the advancement of any argument, said: "Creating a new county by a special Act is not forbidden by the state Constitution." The authority of that decision was recognized in *State ex rel. Sackett* v. *Thomas.* I believe that the

*ipse dixit* in the *Holliday Case* is erroneous. That the framers of our Constitution intended that counties should be created, their boundaries changed, and county seats located, changed, and removed only by general laws of uniform operation, is, to my mind, quite plain. To speak of a county without a county seat would be a contradiction of terms. Every county must have a county seat. (Article XIX, sec. 6, Montana Constitution.) Whenever, then, a county is created, it has a county seat—not a provisional county seat, not a temporary county seat—but a county seat for every purpose. A provisional county seat is the purest creation of the imagination. Our Constitution speaks only of a county seat, and, if prior to the last election Libby was the county seat of Lincoln county, it was as much a county seat as Helena, Butte, or any other seat of county government; and when it was designated as the county seat in the Act creating Lincoln County, the county seat of that new county was in fact located. The county could not have been created without the location of the county seat at some designated place. And because the Constitution forbids the location of a county seat by a special Act of legislation, it impliedly forbids the creation of a new county by that species of legislation. The twelfth legislative assembly, recognizing this spirit and purpose of our Constitution, passed a general law for the creation of new counties and another general law for the location of county seats. By creating a phantom, and designating it a "provisional county seat," this court was able to draw a marked distinction between such creation and a county seat; but the creation is a fiction, the distinction unwarranted, and the effect of such decisions is to ignore a plain provision of the Constitution.

ON REHEARING.

(Submitted June 12, 1911.   Decided July 1, 1911.)

*Lincoln County Act—County Seat—Permanent Location—Special Laws—Constitution—Statutory Construction—Intent of Legislature—Part of Statute.*

Lincoln County—Permanent Location of County Seat—Special Law—Unconstitutionality.
1. *Held,* under section 26, Article V, of the Constitution, that the legislature may not, in a special Act, creating a county, refer the location of its permanent county seat to a vote of the people of the county, but can do so only by a general law of uniform operation throughout the state; and that, therefore, that portion of the Act creating Lincoln County (Laws of 1909, Chapter 133, sec. 2), making it incumbent upon the county commissioners to submit the permanent location of the county seat to a vote of the electors, offends against the special and local law clause of the Constitution, *supra,* and is void.
     MR. JUSTICE SMITH dissenting.

Interpretation of Statutes—Intent of Legislature—Part of Statute.
2. In the interpretation of a statute the courts must look to the statute itself, its history, or both, for the key to the legislative intent, a thing within the intention of its makers being as much within the statute as if within the letter.

Constitution—Special Laws—Prohibition Absolute.
3. The prohibition against local or special laws, in section 26, Article V, of the Constitution, is absolute.

Same—Special Laws—What not Excuse for Enactment.
4. Failure on the part of the legislature to pass a general law on a given subject does not justify the enactment of a special one which is prohibited.

MR. JUSTICE HOLLOWAY delivered the opinion of the court.

The facts are stated fully in the opinion heretofore filed and need not be repeated. Further consideration of the question involved leads us to the conclusion that the effect of our former decision is to nullify a plain provision of our state Constitution.

It will not do to say that the inhibition in section 26, Article V, is aimed only at Acts which seek to locate county seats after they have been once located. A county seat once permanently located cannot be located again. It may be changed or removed, but the removal is covered by another provision of the Constitution. "Locate" and "remove" do not mean the same thing, and when both terms are employed in the Constitution they must be given effect. If the legislature may by special Act

create a county and name the permanent county seat, then the prohibition in section 26, Article V, is meaningless. That the Act under consideration is a local and special law can scarcely be controverted. It falls squarely within the definitions of local and special laws given by the authorities generally. (See authorities cited in 36 Cyc. 986, and 26 Am. & Eng. Ency. of Law, 2d ed., 532.)  In *State ex rel. Sackett* v. *Thomas,* 25 Mont. 226, 64 Pac. 503, this court refers to the Act creating Sweet Grass county as a special Act; while counsel for relator in the original brief filed by them in this case say that the Act creating Park county was a local and special law. If those Acts were local and special, so is the one now under consideration, for the three Acts are practically identical in their provisions.

But it has been urged upon us most earnestly that, since the Act under consideration does not designate a permanent county seat in terms, but only provides the means by which such permanent county seat is to be located, it is not within the meaning of the prohibition contained in section 26, Article V. A review of the history of Montana will aid materially in ascertaining the meaning to be given to the provision of the Constitution here involved.

Both parties to the controversy concede that the legislature may by special Act create a county and name a provisional county seat. Whether that conclusion is right or wrong is not involved here; but, for the purposes of this case, we must assume that such authority is not denied to the legislature, and upon that assumption, determine the only question involved, *viz.:* May the legislature refer the location of a permanent county seat to a vote of the people of the county *by a special Act,* or can it be done *only* by a general law of uniform operation throughout the state?

The legislative history of Montana is divided into three distinct periods, *viz.:* (1) From the organization of the territory in 1864, to July 30, 1886; (2) from July 30, 1886, to the admission of the state, in November, 1889; and (3) from the date of admission to the present time.

1. *Under the Organic Act.*   During this first period, it may be
said that there were not any limitations placed upon the legis-
lative power of the territory in dealing with questions of the
territory's internal affairs.   The first legislative assembly con-
vened at Bannock, in 1864, and passed an Act creating nine
counties, *viz.,* Beaverhead, Big Horn, Choteau, Deer Lodge,
Edgerton, Gallatin, Jefferson, Madison, and Missoula, defining
the boundaries of each and naming for each, except Big Horn, a
provisional county seat.   The Act contains a provision by which
the voters of the several counties might at the next election de-
termine the location of their respective county seats.   (Bannock
Statutes, p. 528.)   By a special Act, approved November 16,
1867, Meagher county was created, and Diamond City designated
the county seat "until the next general election."   Provision
was then made for submitting to the electors the question of
definitely locating the county seat.   (Laws 1867, p. 99.)   Daw-
son county was created in 1869.   The Act provides: "The county
seat of said Dawson county is hereby located at Fort Peck."
(Laws 1868–69, p. 102.)   In 1877 the name of Big Horn county
was changed to Custer.   (Laws 1877, p. 425.)   And in 1879 the
county seat of Custer county was by special Act definitely lo-
cated at Miles.   (Laws 1879, p. 100.)   Silver Bow county was
created in 1881, and Butte made the  permanent county seat.
(Laws 1881, p. 85.)   Yellowstone county was created in 1883,
and Billings made the county seat.   (Laws 1883, p. 119.)   Fergus
county was created in 1885 by a special Act which made Lewis-
town the county seat.   (Laws 1885, p. 78.)

In the meantime the county seat of Edgerton county was
changed by special Act from Silver City to Helena (Laws 1867,
p. 101) ; and on December 20 of the same year, and by another
special Act, the name of Edgerton county was changed to Lewis
and Clark.   (Laws 1867, p. 130.)   At the same session the
county seat of Missoula county was changed by special Act from
Hell Gate to Missoula Mills.   (Laws 1867, p. 107.)   At the same
session the county seat of Deer Lodge county was changed from
Silver Bow to Deer Lodge.   (Laws 1867, p. 102.)

43 Mont.—27

By special Act a public road was established from Bozeman to Helena. (Laws 1867, p. 84.) In 1869 the county commissioners of Madison county were authorized to subscribe $15,000 of the public funds to purchase capital stock of the ''Capital Ditch Company,'' a private corporation. (Laws 1869–70, p. 59.) In 1867, Robert Tingley and John Kennedy were granted an exclusive privilege to lay out and maintain a road around the Great Falls of the Missouri river. (Laws 1867, p. 109.) The fourth territorial legislative assembly passed a number of similar special Acts, of which the following is one: ''That the bonds of matrimony existing between Henry B. Steel and Roena A. Steel, his wife, be and the same are hereby dissolved.'' (Laws 1867, pp. 130–133.) By an Act of the sixth legislative assembly, it is provided: ''That Sarah Francis Gorham, an infant of the age of sixteen, a citizen of Montana, be and she is hereby declared of lawful age.'' (Laws 1869–70, p. 104.) In 1879 the territorial legislature passed an Act ''that the name of Sing On, of the county of Lewis and Clark, in the territory of Montana, be and the same is hereby changed to George Taylor.'' (Laws 1879, p. 116.)

These are only a few of the special laws enacted in the early days of our territorial existence; but it will be observed that the legislature, having been left free to enact special laws, exercised its authority freely and upon a great variety of subjects. At the close of this first period, however, the Congress of the United States passed an Act entitled ''An Act to prohibit the passage of local or special laws in the territories of the United States, to limit territorial indebtedness, and for other purposes.'' (Approved July 30, 1886.) The Act prohibits territorial legislatures from passing local or special laws upon any of twenty-four enumerated classes of subjects, among which are: For granting divorces, changing the names of persons or places, laying out roads or highways, and locating or changing county seats. (Act July 30, 1886, c. 818, 24 Stat. 170; Comp. Stats. 1887, p. 31.)

2. *Under the Organic Act as Modified by the Act of July 30, 1886.* During this period but two counties were created. The Act creating Park county, approved February 23, 1887, pro-

vides that "the village of Livingston * * * shall be the county seat of said Park county until some other place * * * shall be designated as provided by law," followed by a provision for the location of the permanent county seat by a vote of the people. (Comp. Stats. 1887, p. 1238.) The Act creating Cascade county designates Great Falls as the county seat, followed by language similar to that above, except that no provision is made for the location of the permanent county seat. (Laws 1887 (Fifteenth Extra Session 1887), p. 105.)

When the Constitution was adopted, twenty-three of the twenty-four subjects contained in the Act of July 30, 1886, were incorporated in section 26, Article V, with ten other similar subjects. The Act of July 30, 1886, prohibited the territorial legislature from incorporating cities or towns by special Act. Section 26, Article V, of the Constitution, does not contain that prohibition; but in other respects the Constitution follows the exact language of the Act of Congress in prohibiting the legislature from passing any local or special laws for granting divorces, changing the names of persons or places, locating or changing county seats, etc.

3. *Under the Constitution.* Since the adoption of the Constitution, eleven counties had been created when the Act now under consideration was before the legislature. The provisions of the several Acts creating Flathead, Teton, Carbon, Granite, Sweet Grass, and Sanders counties are similar, and similar to the provisions of the Act now under consideration. A temporary or provisional county seat was named, and provision made for an election by the voters of the respective counties to finally fix and determine the location of a permanent county seat. In the Acts creating Valley, Ravalli, Broadwater, and Rosebud, a temporary or provisional county seat was named, and the Act in each instance provides that the place so named shall be the county seat, "until some other place within said county shall be designated as such in the mode and manner provided by law" (Valley County Act [Laws 1893, p. 202]); or "until some other place * * * shall be designated as provided by law" (Ravalli County Act [Laws 1893, p. 209]; Broadwater County Act [Laws

1897, p. 45]); or "until the permanent county seat shall be designated in the mode and manner provided by law" (Rosebud County Act [Laws 1901, p. 97]). The Act creating Powell county provides that Deer Lodge "shall be and remain, until lawfully changed in the manner provided by law, the county seat of Powell county." (Laws 1901, p. 101.)

It will be observed that during the first period above, the territorial legislature had resorted to each of three methods for locating permanently county seats: (1) By permitting the voters to determine the question by ballot, as in the original counties and Meagher county; or (2) by naming the permanent county seat in the Act creating the county, as in Dawson, Silver Bow, Yellowstone, and Fergus; or (3) by locating the permanent county seat by a separate special Act, as in Custer county. But no matter which method was employed, the subject was controlled by a special Act in every instance, and this fact is peculiarly pertinent when we undertake to analyze the Act of [1] Congress of July 30, 1886. By that Act the Congress said to the territorial legislature of Montana: "Hereafter you shall not pass special laws for granting divorces, changing the names of persons or places, locating or changing county seats, regulating the practice in courts of justice, *etc.,* and in all other cases where a general law can be made applicable, no special law shall be enacted." The language is perfectly plain, but what does it mean? Did the Congress intend to say to the legislature: "You shall not pass a special law granting a divorce to John Doe, but you may submit the matter by a special Act to the voters of his community to determine by ballot whether or not John Doe shall be relieved from the bonds of matrimony?" Did it intend to say to the legislature: "You shall not pass a special Act changing the name of Sing On, but you may by special Act authorize some other body to do so, or you may submit the question to a vote of the people of Lewis and Clark county?" Or did it not mean to say: "You shall not pass special laws upon any of these subjects, and neither shall you accomplish the same purpose, by indirection, by referring the matter by special Act to any other body?" In other words, is it not perfectly ap-

parent that the Congress meant to say: ''These subjects shall hereafter be controlled by general laws of uniform operation, and not otherwise?'' To say that the Congress intended that the territorial legislature might by special law refer any of the matters just enumerated to a vote of the people would be so ridiculous that it would not be insisted upon by anyone. If that is true, why should a different rule be applied to the provision relating to the location of a county seat? No distinction is made in the Act between the different subjects treated, and there cannot be suggested a reason for one rule as to the others and a different rule as to this last one. That the Congress intended that all of these enumerated subjects should be controlled by general laws is perfectly manifest.

We are not left in doubt altogether or entirely free to speculate as to the intention of the Congress in passing this measure; for, aside from the manifest purpose contained in the concluding clause of section 1, the legislative history of the Act precludes the possibility of a doubt. The bill for the Act (H. R. 5179) was introduced in the House of Representatives by William M. Springer, of Illinois. It was referred to the committee on territories, of which Mr. Springer was a member, favorably reported, and the report adopted. The Congressional Record discloses that when the bill was up for final passage in the House, its author, Mr. Springer, said: ''Mr. Speaker, the provisions of this bill are copied *verbatim* from the Constitution of the state of Illinois, and similar provisions will be found in the Constitutions of most of the states of the Union. The bill simply prohibits the passage, in the cases enumerated, of local or special laws in the territories. I think one of the greatest abuses in the territories has been the passage of laws of this character. *This bill, if passed, will require general laws on these subjects, instead of special ones.* The subject has been discussed in most of our states in the formation of our state Constitutions, and wherever provisions of this character have been adopted the most salutary results have followed. I think the same benefits should be extended to the territories.'' (Vol. 17, Cong. Rec. 4062.) There was not any further discussion of the measure on its merits in

either branch of Congress, but this construction of it by its author appears to have been accepted as correctly voicing the intention of Congress in passing the measure.

In *State ex rel. Hay* v. *Hindson,* 40 Mont. 353, 106 Pac. 362, this court announced the universal rule of statutory construction [2]   as follows: "A thing which is within the intention of the makers of a statute is as much within the statute as if it were within the letter.   *   *   *   Necessarily, the courts must look to the statute itself, its history, or both, for the key to the legislative intent." Applying this rule, and the Act of July 30, 1886, in plain and unmistakable terms declared that a permanent county seat in any of the territories could be located thereafter only by a general law.

It might appear that undue prominence has been given to the Act of July 30, 1886, and the manifest intention of the Congress in passing it; but not so. When our constitutional convention assembled in 1889, it took the provisions of the Act of July 30, 1886, bodily and incorporated them in section 26 of Article V, without the change of a word, eliminating only one provision, that against the incorporation of cities and towns. This is conceded by counsel for relator in their original brief. If the framers of our Constitution meant anything, then, by thus borrowing from the Act of the Congress the matters contained in the prohibition in section 26, Article V, they meant to give the same effect to this part of the Constitution as was given to the Act of the Congress. They meant that the same purpose which prompted the enactment of the one likewise prompted the other. They meant that the same intention should be a part of each, and the Congress having manifested its intention that the location of a county seat should be governed exclusively by general laws, the framers of our Constitution intended that the same rule should prevail under statehood. That intention is manifested also by the terms of the Constitution itself. Many of the older states have constitutional prohibitions similar to those contained in section 26, Article V, of ours. In the Constitution of Florida, there is a section (Article III, sec. 20) enumerating a list of subjects upon which the legislature is forbidden to pass local or

special laws; then follows this provision: "In all cases enumerated in the preceding section, all laws shall be general and of uniform operation throughout the state." (Sec. 21.) The Constitution of Iowa (Article III, sec. 30), after enumerating the prohibited subjects, proceeds: "In all the cases enumerated, and in all other cases where a general law can be made applicable, all laws shall be general and of uniform operation throughout the state." Our Constitution, after enumerating the subjects upon which the legislature is prohibited from passing local or special laws, proceeds: "In all other cases where a general law can be made applicable, no special law shall be enacted." It is not possible that any doubt could arise as to the meaning of that portion of the Florida Constitution quoted above.

But there is not any difference in meaning between the language in the Florida or Iowa Constitution and that in our own Constitution above. When the framers of our Constitution said the legislature shall not pass special laws for granting divorces or locating county seats, they knew that these subjects must of necessity be dealt with by law, and in prohibiting special laws they impliedly commanded that they be dealt with only by general laws. When a special law is prohibited, a general law only can be enacted, for there are not any other kinds. Viewed in the light of the history surrounding its origin, the concluding prohibition of section 26, Article V, of our Constitution above, means just what the Florida Constitution means. "In all cases enumerated all laws shall be general and of uniform operation throughout the state." That the prohibition in [3] section 26, Article V, is absolute does not admit of doubt. (*State ex rel. West* v. *City of Des Moines,* 96 Iowa, 521, 59 Am. St. Rep. 381, 65 N. W. 818, 31 L. R. A. 186.) In addition to this manifestation by the framers of the Constitution of their intention in drafting the provision in section 26, Article V, it is worthy of note that, since the adoption of the Constitution, the legislature of this state, in treating of any of the enumerated subjects in that section, excepting locating county seats, has done so by general laws. This practice has been absolutely uniform for more than twenty years, and tends at least to evince a legis-

lative construction of our constitutional provision in harmony with the views here indicated. On the other hand, there has not been any uniform construction of the provision, so far as it relates to the location of county seats. Flathead, Teton, Granite, Carbon, Sweet Grass, and Sanders counties were created by special Acts similar to the one now under consideration. But Valley, Ravalli, Broadwater, and Rosebud were created by special Acts in which no provision whatever was made for the location of the permanent county seat in any one of these counties; while in the case of Powell county it would appear that the legislature undertook to locate definitely the county seat of that county in the Act creating it.

Under a Constitution the meaning of which cannot be distinguished from our own, or from the Act of July 30, 1886, the supreme court of West Virginia, in a case involving the same question as is now before us, held that the constitutional prohibition is not limited to forbidding a special law which in terms definitely locates a county seat, but is intended to forbid as well special legislation which seeks to accomplish the purpose by submitting the matter to a vote of the people; in other words, the constitutional prohibition is aimed against the kind of legislation employed for the purpose. (*Groves* v. *County Court*, 42 W. Va. 587, 26 S. E. 460.)

The framers of our Constitution declared in most vigorous terms that the legislature shall not pass local or special laws upon any subject, if a general law can be made applicable, and by prohibiting special laws upon the particular subjects enumerated in section 26, Article V, they declared that general laws can be made applicable to all of those subjects, one of which is locating or changing county seats.

The cases which recognize the right of the legislature by special Act to designate a temporary county seat for a newly created county make a clear distinction between a temporary or provisional county seat and a county seat actually located. (*Doan* v. *Board of Commissioners*, 2 Idaho, 781, 26 Pac. 167; *Attorney General* v. *Board*, 64 Mich. 607, 31 N. W. 539.)

In their original brief counsel for relator say: " 'Locating' means establishing a fixed and permanent county seat, and 'changing county seats' means the removal of an established, fixed, and permanent county seat to another established, fixed, and permanent county seat." We agree with this fully, and we may add: To remove a county seat means to change it from one fixed place to another fixed place. As used in the Constitution, with reference to county seats, "change" and "remove" of necessity mean the same thing and are used interchangeably, or as synonymous. The provision with reference to locating a county seat is operative only before a permanent county seat has been fixed or established, while the provisions relating to change or removal are operative only after a permanent county seat has been established. (*Doan* v. *Commissioners, supra.*) The cases dealing with questions of removal of county seats cannot have any application to the question involved here.

We assume, for the purposes of this case, that the legislature may by special Act create a county and name a provisional county seat, but beyond that it cannot go, so far as any question involved here is concerned. But it is suggested that the failure of the legislature to pass a general law for the location of county seats would defeat the will of the framers of the Constitution in drafting section 26, Article V, and the will of the people in adopting it, by continuing the provisional county seat for an indefinite period of time, and this may be so; but the same thing may also occur in many other instances. Our Constitution contains at least seventeen distinct provisions, in each of which the legislature is commanded to do some particular Act; but there is no means of coercing the legislature, and its failure to respond in these particulars, or in any of them, to that extent defeats the will of the framers of the Constitution and the people. But for such failure, if any, on the part of the lawmakers, the people always have a means of redress at the polls. But the fact, if it is a fact, that the legislature has been derelict in failing to pass [4] a general law for the location of permanent county seats does not justify a special law which is prohibited. As between

the Constitution and the laws of this state, the Constitution is supreme, and in determining the question before us we have but to compare the Act in question with the Constitution, and if they conflict it is our duty to uphold the Constitution, let the consequences be what they may be. Our last legislative assembly, apparently recognizing the necessity for a general law for locating county seats, passed a measure evidently designed to supply the deficiency in our laws.

It is also suggested in the brief of counsel for relator that, if this Act cannot be upheld as one providing for a vote to locate the permanent county seat, it can be upheld as one providing for a vote upon the question of a *temporary county seat;* but this cannot be so. Such a conclusion would be directly antagonistic to the manifest intention of the legislature. Section 3 of the Act creating Lincoln county provides for submitting to the voters the question of the location of a permanent county seat, and it was upon that question that the people voted, not upon the question of a temporary county seat.

The Act creating Lincoln county, in so far as it attempts to make provision for the permanent location of the county seat, is unconstitutional and void, being a local and special Act directly prohibited by section 26, Article V of the Constitution. This conclusion does not interfere in the least with the application of the principle of local self-government. We do not hold that the people of Lincoln county may not by vote determine where the permanent county seat shall be located. We do say that if they proceed to that end, it must be done under a general law of uniform operation.

The motion and demurrer are sustained, and this proceeding is dismissed.

*Dismissed.*

MR. CHIEF JUSTICE BRANTLY: When this case was first decided, I was inclined to the view that the provision of the Act permitting the voters of Lincoln county to locate the permanent county seat is not open to the objection that it is special legislation within the purview of the Constitution; but, upon examination

of the history of the prohibition and further consideration of the purpose had in view by its adoption, I am satisfied that the conclusion reached by MR. JUSTICE HOLLOWAY is correct. I therefore concur.

MR. JUSTICE SMITH dissents.