[No. 32910. *En Banc.* August 3, 1954]

THE STATE OF WASHINGTON, *on the Relation of Gerry Lemon et al., Respondents,* v. ARTHUR B. LANGLIE, *as Governor, et al., Appellants.*[1]

[1]Reported in 273 P. (2d) 464.

*The Attorney General* and *Ralph M. Davis, Assistant,* for appellants.

*John Spiller, Smith Troy,* and *Philip W. Richardson,* for respondents.

DONWORTH, J.—Relators in this action are four private citizens and taxpayers of this state and one domestic corporation doing business and paying taxes in this state.

Relators commenced this action by filing a petition in mandamus in the superior court for Thurston county seeking a writ of mandate to compel the governor of the state and the individual heads of thirteen state agencies (each agency being a part of the executive department of the

state) to move the offices of those agencies from Seattle, where they now are located, to Olympia, the state capital.

The petition alleged that respondent Arthur B. Langlie was and is the governor of the state of Washington and, as such, charged with the duty of seeing to it that his appointees (the other named respondents) observe the letter and spirit of the organic law of the state respecting the seat of government, and that they maintain their principal offices at the seat of government.

Relators further alleged that the other respondents were and are, respectively, the heads of thirteen state agencies, each of which is a legislatively created agency exercising a portion of the sovereign executive and legislative power of the state, and that they are maintaining their respective principal offices away from the seat of government and in Seattle, Washington, "contrary to the letter and spirit of the organic law of this state."

These thirteen state agencies are: the state aeronautics commission, the state athletic commission, the state board of accountancy, the state board against discrimination in employment, the state board of pharmacy, the state board of prison terms and paroles, the director of the state department of fisheries, the state game commission and the director of game, the director of the state department of health, the state horse racing commission, the state personnel board, the state parks commission, and the state power commission. It was alleged that the individual respondents who comprise the various boards, commissions, and departments, respectively (other than the state power commission), were responsible, individually and jointly, for maintaining the offices of their respective state agencies away from the seat of government and at Seattle, contrary to the letter and spirit of the organic law of the state.

With respect to the thirteenth state agency involved, to wit, the state power commission, it was alleged that, while the members thereof had not yet located the principal office of the agency, it had been publicly announced that they intended to and would establish the principal office of this

agency away from the seat of government and at Seattle, contrary to the letter and spirit of the organic law of the state.

Paragraph 15 of the petition alleged:

"That none of the agencies of the state government afore-said is a charitable, eleemosynary, penal, reformatory or educational institution which by the intendment of the organic law may be established elsewhere than at the seat of the government; and that the acts of the several agencies aforesaid, and of the respective board members, commission members and directors constituting such agencies, in maintaining their principal offices elsewhere than at the seat of the government are violative of the provisions, among others, of Article XIV of the state Constitution, section 13 of the Organic Act, and sections 12, 17, 21 and 24 of the Enabling Act."

The petition further alleged that a written communication on behalf of the relators had been mailed to respondent governor, postage prepaid, demanding that he, in his capacity as chief executive of the state, "forthwith order all state officers, agencies, boards, commissions and departments not complying with the organic law in this connection, excepting those administering educational, penal, charitable and eleemosynary institutions legally established elsewhere, to return to the capital at Olympia all such of their offices, together with books and records, as are not necessary local or branch offices," or in the alternative that he "direct and require the attorney general to institute immediate legal proceedings looking toward such return;" that the governor had not acknowledged receipt of the demand or indicated to relators what his position with respect to the demand was, but that he had been quoted in the public press as saying he was not inclined to consider the demand, and that, from his failure to act and from the newspaper comment, the relators believed, and alleged it to be a fact, that respondent governor had declined to act on the demand of relators.

It was also alleged that relators had addressed a written demand to the attorney general of the state requiring him to act in the premises, and that on January 11, 1954, the

attorney general in writing had declined to initiate legal action looking to the return to the seat of government of the state agencies named in the petition which are maintaining their principal places of business away therefrom.

Prior to the hearing on respondents' motion to quash the alternative writ, the parties stipulated that:

". . . the petition of relators herein be deemed amended to show that none of the respondent agencies, boards, commissions, or departments, at the time of or since the filing of the petition herein, maintained an office at the capital; that the annual rentals, provided in the main by the general fund of the State of Washington, paid or to be paid by the several respondents herein for office space in the City of Seattle, total $120,878.56; and that the said general fund of the State of Washington as of March 18, 1954, shows an average deficit of approximately $45,000,000.00."

The prayer of the petition was as follows:

"WHEREFORE the relators pray for the issuance out of this honorable court of a writ of mandate commanding the several respondents herein forthwith to return to and thereafter maintain at the capital city at Olympia the principal offices, together with books and records, of the respective state agencies which they constitute, or in the alternative commanding them to appear at a day certain and show cause why they have not done so."

The trial court, after considering the verified petition in mandamus and on motion by relators' counsel, entered an order directing the issuance of an alternative writ of mandate, which was issued.

In response thereto respondents appeared and filed a motion to quash and dismiss the alternative writ of mandate and dismiss the petition in mandamus on these grounds:

"(1) The court has no jurisdiction over the person of the respondents, or of the subject matter of the action;

"(2) That the relators have no legal capacity to sue;

"(3) That there is a defect of parties, relators and respondents;

"(4) That the petition does not state facts sufficient to constitute a cause of action; and

"(5) That the petition reveals a lack of sufficient legal grounds to entitle relators to the relief sought."

Before the hearing on the motion to quash and dismiss was held, the parties stipulated that:

". . . the purpose of this action is to obtain a judicial interpretation of the seat of government provision (Article XIV) of the Washington State Constitution, and certain related provisions of the Organic Act and Enabling Act; and no issue is raised involving the effect or application of any statute of the State of Washington. . . ."

At the hearing on the motion to quash and dismiss, all parties and the trial court treated the motion as equivalent to a demurrer to the petition. After hearing arguments, the trial court entered an "Order overruling Demurrer" which recited:

"IT IS ORDERED, ADJUDGED AND DECREED that the demurrer of the respondents, as respects each and every ground set forth in the demurrer, and more particularly the following grounds:

"(1) That the relators have no capacity to sue;

"(2) That the court has no jurisdiction over the subject matter of the action;

"(3) that the court has no jurisdiction of the person of the respondent governor; and,

"(4) that the petition does not state facts sufficient to constitute a cause of action,

"be and the same is hereby overruled."

After the entry of the above order, respondents refused to plead further, having announced in open court their election to stand upon the demurrer and to take an appeal to this court. The trial court then entered an order for the issuance of a peremptory writ of mandate to the governor and to the individual persons constituting the heads of the thirteen state agencies named in the petition.

The peremptory writ of mandate issued in accordance with the order contained this directive:

"NOW, THEREFORE, *you, and each of you, are hereby commanded forthwith to return to and thereafter maintain at the capital city at Olympia the offices,* together with the books and records, *of the respective state agencies, boards, commissions and departments which you severally constitute; . . .*" (Italics ours.)

This appeal was then taken. In order to avoid confusion, we will continue to refer to the parties as relators and respondents.

The two assignments of error made in this court are:

"(1) The court erred in overruling the demurrer.

"(2) The court erred in entering judgment for the respondents issuing the writ of mandate."

If the demurrer was properly overruled, there was no error in entering the order for the issuance of the peremptory writ of mandate after respondents refused to plead further. Consequently, we will limit our consideration to the question of whether or not the demurrer should have been sustained.

In support of their contention that relators had no capacity to sue, the brief of the heads of the state agencies says:

"The rule is that private citizens and taxpayers may not maintain an action against state officers in matters of public concern, except upon a showing of some special interest or damage different than that suffered by the public at large."

Respondents cite ten cases in support of the foregoing rule, beginning with *Jones v. Reed*, 3 Wash. 57, 27 Pac. 1067, and ending with *Sasse v. King County*, 196 Wash. 242, 82 P. (2d) 536.

The same cases relied upon by respondents here were cited to this court in the more recent case of *Reiter v. Wallgren*, 28 Wn. (2d) 872, 184 P. (2d) 571, in support of the same rule. In the *Reiter* case, we rejected the broad rule contended for by respondents here. After considering all of our previous cases on the subject, we there said:

"We never have held that, in a proper case *where the attorney general refused to act to protect the public interest*, a taxpayer could not do so."

We then laid down this rule:

"In the absence of a statute governing suits by taxpayers, a demand upon the proper public officer to take appropriate action is a condition precedent to the maintenance of a taxpayer's action challenging the validity and legality of what public officers are intending to do or have done, unless facts are alleged which sufficiently show that the demand to bring suit would have been useless."

After enunciating the rule to be applied by the court in the *Reiter* case, we held that the taxpayer involved was not entitled to maintain the suit because he had not made any demand upon the proper official (the attorney general) to bring the action against the state capitol committee (which was the state agency concerned) and had not alleged facts showing that such a demand would have been useless.

In the case at bar, respondents characterize the rule laid down in the *Reiter* case as "dicta." They argue that, since the court in the *Reiter* case arrived at the same result as would have been reached if the court had applied the rule (that a taxpayer cannot maintain such an action unless he alleges and proves "direct, substantial and pecuniary injury to himself"), the statement of that rule was unnecessary to the decision and thus *dicta*.

We do not consider the rule enunciated in *Reiter v. Wallgren, supra, dicta.*

The word "dicta," in the sense in which it is used by respondents, is the plural of *dictum*, defined in Black's Law Dictionary, 4th ed., p. 541, as follows:

"The word is generally used as an abbreviated form of *obiter dictum*, 'a remark by the way;' that is, an observation or remark made by a judge in pronouncing an opinion upon a cause, concerning some rule, principle, or application of law, or the solution of a question suggested by the case at bar, but not necessarily involved in the case or essential to its determination; any statement of the law enunciated by the court merely by way of illustration, argument, analogy, or suggestion."

The question involved in the *Reiter* case, *supra*, was whether a taxpayer could maintain an action against state officials involving a matter of public concern without having a direct pecuniary interest in the actions of the officials which were challenged by the suit. To decide that question, it was necessary for the court first to determine *whether any taxpayer, under any circumstances, could maintain such a suit.* If that question had been answered in the negative, it would have disposed of the action completely.

After consideration of the ten prior cases cited by the

taxpayer involved in that case, this court answered the question in the affirmative. Then, and only then, did it become necessary to decide whether the taxpayer in the *Reiter* case was entitled to the benefit of the rule. Even though we held that he had not shown compliance with the rule, the statement of this legal principle was still necessary to the decision reached. Otherwise, the vital preliminary issue could not have been decided.

We hold that our decision in *Reiter v. Wallgren, supra,* is controlling here on the issue of relators' right to maintain this action. Since, prior to instituting the present mandamus proceeding, they had demanded that the attorney general take legal steps to cure the alleged illegal actions on the part of respondents, and since the attorney general had refused to act, relators are entitled to bring this action, and thus they have capacity to sue.

In support of their second contention (that the trial court had no jurisdiction over the subject matter of the action), respondents urge that questions having to do with the location of a seat of government are political and not judicial questions, and that courts consequently cannot take jurisdiction of such issues. In support of the proposition that such questions are political and not judicial, respondents cite three Washington cases: *Morris v. Board of County Com'rs,* 195 Wash. 173, 80 P. (2d) 414; *Parmeter v. Bourne,* 8 Wash. 45, 35 Pac. 586, 757; *Mann v. Wright,* 81 Wash. 358, 142 Pac. 697. All of these cases have to do with attempts to move a county seat from one city or town to another city or town by means of an election.

In two other cases, however, this court has held that trial courts properly took jurisdiction of cases involving the removal of county seats from one location to another. Those cases were *Rickey v. Williams,* 8 Wash. 479, 36 Pac. 480; and *Krieschel v. Board of County Com'rs,* 12 Wash. 428, 41 Pac. 186.

All of the earlier cases having to do with the removal or location of county seats were re-examined by this court in *Morris v. Board of County Com'rs, supra,* in which we said:

"We have consistently held that the location or removal of a county seat is a political or public question and, in the absence of a statute giving the court jurisdiction of such matters, it will not interfere with the board of county commissioners *when the board follows the directions of the statutes*." (Italics ours.)

In the case at bar, respondents do not pretend that they followed the directions of any statutes in locating the offices of the thirteen agencies away from the seat of government. Furthermore, if they had followed the directions of any statute, the question would still remain whether such statute was in violation of the mandate of the provisions of the state constitution relating to the maintenance of certain offices at the seat of government.

We are convinced that, if rules of law discussed in the county seat cases have any application at all to this case, *Rickey v. Williams, supra,* and *Krieschel v. Board of County Com'rs, supra,* are precedents for holding that the trial court had jurisdiction of the subject matter of the action.

Even if we disregard the county seat cases as precedents in this proceeding, involving as it does the seat of government of the state, we find precedents from other states for holding that the courts do have jurisdiction in an action of this nature.

The supreme court of Oklahoma in *State ex rel. Attorney General v. Huston,* 27 Okla. 606, 113 Pac. 190, held that the district courts of that state had jurisdiction of the subject matter of an action to enjoin the allegedly illegal removal of the seat of government of the state.

In *State ex rel. McCain v. Metschan,* 32 Ore. 372, 46 Pac. 791, 53 Pac. 1071, the supreme court of Oregon held that a circuit court of that state had jurisdiction of the subject matter of an action involving the threatened construction of an insane asylum away from the state's seat of government in violation of the Oregon constitution.

The territorial predecessor of this court, in the *Seat of Government Case,* 1 Wash. Terr. 115 (decided in 1861), simply assumed, as did all of the parties to the controversy, that the court had jurisdiction of the subject matter to de-

cide where the seat of government of the territory of Washington was located after the legislative assembly had passed two inconsistent bills on the subject.

Likewise, the supreme court of California in *People ex rel. Vermule v. Bigler*, 5 Cal. 24, decided in 1855, simply assumed that the court had jurisdiction of the subject matter of an action to determine whether San Jose or Sacramento was the seat of government of that state.

Respondents argue that *State ex rel. Attorney General v. Huston, supra,* and *State ex rel. McCain v. Metschan, supra,* are not precedents for the proposition that the courts have jurisdiction of the subject matter of an action involving the location of a part of the seat of government of a state because both cases were brought by the attorney general of the state. The question of the jurisdiction of the court over the subject matter of the action is separate and distinct from the question of the capacity of a party to maintain the action. Consequently, the two cited cases are direct authority for the holding that the courts do have jurisdiction over the subject matter of such an action as the one at bar.

■ We are convinced that the courts of this state do have jurisdiction over the subject matter of actions involving the location or moving of the state seat of government, and so hold.

Respondents urge in support of their third contention (that the court had no jurisdiction over the person of the governor) that the general rule is that mandamus will not lie to the governor of a state. There are two lines of authorities on this subject, and they are in direct conflict. See note in 105 A. L. R. 1124 *et seq.* That question has not been previously considered by this court.

We do not think that it is either necessary or proper for this court to decide in the present case the important question of whether mandamus will lie to the governor, because a decision on that question is not necessary to a final disposition of this proceeding for the following reasons:

First, the language used by the trial court in the order authorizing the issuance of the peremptory writ of mandate

and in the writ of mandate itself does not command the governor to do anything. The writ commands the other respondents, who are the heads of the thirteen state agencies involved in this suit, to

" . . . *return to and thereafter maintain at the capital city at Olympia the offices,* together with the books and records, *of the respective state agencies, boards, commissions and departments which you severally constitute.* . . ." (Italics ours.)

Since the governor does not act in the capacity of a member of any board or commission or as a director of any of the thirteen state agencies named in the peremptory writ of mandate and does not, either alone or with the other respondents, "severally constitute" any of these agencies, its command does not embrace the governor within its terms.

Second, relators concede, both in their brief and in oral argument to this court, that the governor is only a nominal party in this action, whose dismissal from the action would not affect the result of the suit. In their brief, relators say:

" . . . whether or not in the last analysis the governor is or should be subject to mandamus is not too important at the present time. Conceivably the governor might be dismissed from the action. The main ·question, whether the respective heads of the several agencies, boards, commissions and departments of the state government maintaining their offices elsewhere than at the capital city can properly do so, would still remain to be decided."

In the case of *State ex rel. Hartley v. Clausen,* 146 Wash. 588, 264 Pac. 403, where the governor instituted a suit for injunction against two other state officers to enjoin certain official acts, we pointed out that, under the state constitution, the governor is the highest executive authority and then said:

"Under our form of government, it is the right and duty of the judicial department to interpret the law and declare its true meaning and intent. Equally, it is the right and duty of the executive department to see that the laws as thus interpreted are properly enforced. As the final right to determine the true intent and purpose of all laws is lodged in the supreme court of this state, so is the final determination

as to their enforcement and execution lodged in the governor."

■ The only allegations of the petition concerning the governor indicate that he has declined to take any action in the premises, presumably because he deemed it proper to let the courts decide the controversy. In the absence of any allegation that he will not abide by the decision of this court in its interpretation of the applicable provisions of the constitution, we must presume that the governor will perform his duty to see that the constitution and laws are faithfully executed. *Trotter v. Frank P. Gates & Co.*, 162 Miss. 569, 139 So. 843.

■ It is our view that this court should not pass upon a question of such importance as the issue of whether mandamus will lie to the governor unless and until there is a genuine controversy before us which makes such a decision necessary to its final determination. In the case at bar, the result will be the same whether mandamus will lie to the governor or whether it will not. The peremptory writ is binding on the other respondents, and the controversy can be completely disposed of without the presence of the governor. For these reasons, we hold that the governor should be dismissed as a respondent in this proceeding, and that his name should be stricken from the peremptory writ.

Respondents' fourth and last contention is that relators' petition does not state a cause of action. This brings us to the merits of the controversy and requires this court to decide whether the establishing and maintaining of the principal offices of the thirteen state agencies in Seattle instead of in Olympia constitutes a violation of the applicable provisions of the state constitution, the organic act, and the enabling act.

We point out at the outset that this court is not concerned with the wisdom or desirability of maintaining these state offices either in Seattle or Olympia. We have nothing to do with any considerations of policy, efficiency, economy, or public convenience. Our function is solely to interpret the provisions of the state constitution which bear upon the

authority of respondents (other than the governor) to act in the premises. The problem presented is purely a question of constitutional law.

In order to decide whether the offices of the thirteen state agencies must be maintained at the "seat of government," we should inquire first what the phrase "seat of government" means.

The brief of the attorney general in behalf of the heads of the thirteen state agencies defines the phrase "seat of government" by quoting Webster's New International Dictionary, 2nd ed., as follows:

"A place, especially a city, from which authority is exercised; capital; as, a seat of government."

In their brief, the relators accept the definition relied upon by respondents and assert that the facts in this case disclose that the city from which a portion of executive authority of the state is being exercised by these thirteen agencies is Seattle, not Olympia, the capital city.

Historically, the seat of government of the newly created territory of Washington was located in Olympia initially by the act of Governor Isaac I. Stevens in calling for the first legislative assembly of the territory to convene there on February 27, 1854. He called for the convening of the territorial assembly at Olympia pursuant to the authority vested in him by the congressional act of March 2, 1853, commonly called the organic act, which created the territory. This act provided that the first session of the legislative assembly of the territory should be held "at such time and place in said Territory as the Governor thereof shall appoint and direct."

The organic act, which created the framework for the government of the new territory, further provided in § 13 thereof:

". . . at said first session, or as soon thereafter as they shall deem expedient, the legislative assembly shall proceed to locate and establish the seat of government for said Territory, at such place as they may deem eligible; which place, however, shall thereafter be subject to be changed by said legislative assembly."

At its first session in 1854, the legislative assembly did not enact any statute locating and establishing the seat of government. In 1855, however, the legislative assembly did locate and establish the seat of government at Olympia. Congress then made an appropriation of thirty thousand dollars for the erection of a capitol building and other necessary public buildings.

During the session of the legislature starting in December, 1860, the legislative assembly passed two statutes dealing with the location of the territorial seat of government. One act was entitled "AN ACT to permanently locate the seat of government for the Territory of Washington." This act purported to locate the seat of government at Vancouver, Washington. The second act was entitled "AN ACT requesting the vote of the people of the Territory of Washington relative to the seat of government." This act provided that the voters of the territory should vote at the next annual election to name their choice of the place to be the seat of government.

Olympia received a majority of the votes cast in the election called pursuant to the terms of the second act.

The territorial supreme court, in the famous *Seat of Government Case*, 1 Wash. Terr. 115, decided in December, 1861, held that the first act, purporting to permanently locate the seat of government at Vancouver, was invalid for two reasons: (1) the territorial assembly did not have authority to permanently locate the seat of government, having only authority to "change" the seat of government, and (2) the act contained no enacting clause. The court also held that, since the two acts relating to the same subject were passed at the same session of the legislative assembly, the acts were in *pari materia*. Consequently, the court decided, the intent of the legislative assembly was that the seat of government was to be removed (by terms of the first act) unless the removal was restrained by the will of the people by a vote in favor of retaining the seat of government at Olympia (by terms of the second act).

Since the vote had favored keeping the seat of govern-

ment at Olympia, the court in the *Seat of Government Case* concluded that the territorial capital should remain at Olympia.

When Congress passed the enabling act on February 22, 1889, providing that the territory of Washington might become the state of Washington by framing and adopting its own state constitution as a prerequisite to admission as a state of the union, the act made no reference to the place of the "seat of government." However, §§ 12 and 17 of the act did refer to acts to be performed at the "capital" of the state.

Section 12 of the enabling act granted the state fifty sections of the unappropriated public lands within the state "for the purpose of erecting public buildings at the capital of said states for legislative, executive, and judicial purposes." Section 17 of the act granted to the state "for public buildings at the state capital, in addition to the grant hereinbefore made for that purpose, one hundred thousand acres."

The state constitution, framed by a specially called constitutional convention and adopted by vote of the people in 1889 in accordance with the provisions of the enabling act, contains several references to the "seat of government." Article III, § 24, providing for the location of the executive departments of the state created by Article III, § 1, says:

"The governor, secretary of state, treasurer, auditor, superintendent of public instruction, commissioner of public lands, and attorney general shall severally keep the public records, books, and papers relating to their respective offices at the seat of government, at which place also the governor, secretary of state, treasurer, and auditor shall reside."

■ Like all other sections of our state constitution, these provisions are mandatory, since the section contains no express declaration to the contrary (Art. I, § 29).

It will be noticed that Article III, § 24, requires all of the officers making up the executive department of the government, with the exception of the lieutenant governor, to maintain their offices at the seat of government. (The lieutenant governor, strictly speaking, has no executive duties at all except when he is acting as governor, at which time

he is required by the mandate of the constitution to reside at and keep the records of his office at the seat of government. Article III, § 16, provides that the lieutenant governor shall be presiding officer of the state senate, but while acting as such presiding officer the lieutenant governor actually is serving as an officer of the legislative branch of government and not as an officer of the executive department.) Consequently, the constitution requires all of the executive officers of the state known at the time it was framed and adopted to maintain their offices at the seat of government.

Article XIV, § 1 says, in part:

"The legislature shall have no power to change or to locate the seat of government of this state; but the question of the permanent location of the seat of government of the state shall be submitted to the qualified electors of the territory, at the election to be held for the adoption of this constitution. A majority of all the votes cast at said election, upon said question, shall be necessary to determine the permanent location of the seat of government for the state; and no place shall ever be the seat of government which shall not receive a majority of the votes cast on that matter. . . ."

Article XIV, § 2, in full, says:

"When the seat of government shall have been located as herein provided, the location thereof shall not thereafter be changed except by a vote of two-thirds of all the qualified electors of the state voting on that question, at a general election, at which the question of the location of the seat of government shall have been submitted by the legislature."

The seat of government of the state was located at Olympia in 1890 as a result of the votes cast at an election upon that issue. No election since then has authorized the removal of the seat of government from Olympia to any other city.

It is the position of the relators that, inasmuch as the principal offices of the thirteen executive agencies of the state have been established and are being maintained at Seattle, part of the seat of government of the state has been moved from Olympia to Seattle in violation of the provi-

sions of § 1 and § 2 of Article XIV of the constitution. The respondents contend, on the other hand, that the phrase "seat of government," as used in the constitution, refers to the place or location of the state government or, in other words, to the capital city, and does not refer to the location of a particular board, officer, or agency or some group exercising governmental authority.

From our study of the constitution in the light of the enabling act and the historical background of our territorial laws and the case law of other state courts which have had occasion to decide suits involving the location of state seats of government, we are convinced that the relators are correct. We feel certain that it was the intention of the framers of our state constitution and of the people in adopting it to provide that the whole of the executive department of the state should be located and maintained at the seat of government.

The framers of the constitution provided that all of the then known executive departments of the state should be located at the seat of government. Because the framers of that instrument did not go further and provide that any additional executive department or agency that might be thereafter created by the legislature also should maintain its office at the seat of government, respondents urge that it was the intention of the framers of the constitution that there should be no mandatory restrictions upon the location of subsequently created executive agencies. Respondents, in support of that argument, say:

"This is but the application of the well-known rule of construction that the express mention of one thing implies the exclusion of others."

We think that rule can have no application in a situation like the one at bar. The executive agencies which respondents argue are "excluded" by the language of the constitution were not even in existence when the constitution was framed and adopted by the people; hence there is little logic in arguing that the makers of the constitution "excluded" that which did not then exist to be excluded.

In support of their argument that it was not the intention of the framers of the constitution to require executive agencies created after the formation of the state to be located at the seat of government, respondents cite several examples of early day state agencies which respondents say maintained their offices away from Olympia. One such example is the fish commission, created by an act of the legislature approved February 20, 1890. (Laws of 1889-90, p. 233) The act creating the fish commission did not specify where the commission should maintain its offices. Respondents assert that the first commissioner maintained the office of the agency in Vancouver, the second commissioner moved the offices of the agency to Tacoma, the third commissioner moved the offices to Whatcom (now Bellingham), and a later commissioner moved the offices of the agency to Seattle in 1914, where they have remained until this time. Over the years, the agency was divided by acts of the legislature, until at the present date two agencies, the department of fisheries and the department of game, have been created.

The first fish commissioner during territorial days was the "fish commissioner for the Columbia river and its tributary waters." That position was created by "An Act to encourage the establishment of hatching-houses on the waters of the Columbia river, for the propagation of salmon." Laws of 1877, p. 294. In 1879, the legislative assembly enacted "An Act to create the office of fish commissioner for the Columbia river, to license the taking of salmon in the Columbia river and its tributaries and to encourage the establishment of hatching houses on the waters of the Columbia river for the propagation of salmon." Laws of 1879, p. 101. The act provided that the fish commissioner "shall be a resident of one of the counties bordering upon said river." When the first office of state fish commissioner was created by the act of February 20, 1890, no provision was made as to where the office should be located. However, the fish commissioner, like his territorial predecessor, was a resident of "one of the counties border-

ing on said [Columbia] river" (at Vancouver) because that is where the bulk of his work was to be performed.

■ We do not think, however, that the fact that the first fish commissioner, like his territorial predecessor, lived away from the seat of government could in any way change the intention of the framers and adopters of the constitution. The first state fish commissioner received a salary of two thousand dollars annually and had authority to hire two part-time deputy fish commissioners, who could receive two hundred fifty dollars each annually. The present department of fisheries and state game commission have grown to be major executive departments of the state, with little resemblance to the office of the first fish commissioner. We see nothing in the fact that the first fish commissioner maintained his office at Vancouver to warrant the conclusion that the framers of the constitution intended that all executive agencies having to do with fish or game could have their offices wherever the heads of such departments wished to locate them. The framers of the constitution certainly could not be bound or estopped by the failure of the legislature to require that the one-man office of the fish commissioner be located at the capital. Constitutions cannot be amended by estoppel, and the intent of the framers of the constitution and the people who adopted that instrument cannot be changed by failure to act on the part of the legislature.

A second example cited by respondents is the board of health. In their brief the heads of the thirteen agencies say:

"The board of health was the ancestor of the state department of health. Its history antedates statehood. The first office of the territorial board of health was established in Port Townsend, W. T., in 1887. The state board of health which was merely a continuation of the old Territorial Board, was created by chapter 98, Laws of 1891, approved March 7, 1891. It was not originally a permanent department but a policy making board. Section 9 of that act required the board to hold meetings:

" ' . . . in January and June of each year, and at such other times as the board shall deem expedient. The meet-

ing in *January* of each year *shall be at the capital* . . .'
(Emphasis supplied.)

"The language shows very clearly that the legislators did not consider the board of health to be affected by the 'seat of government' provision of the constitution. . . ."

An examination of the session laws of the territorial legislature and the 1891 session laws of the state legislature discloses that the foregoing analysis in the brief of the heads of the state agencies is not factually correct.

The board of health which was the ancestor of the present state department of health *did not* antedate statehood. The legislature of the territory in 1881 did create a board of health, but it was *not* a "territorial board of health." The act creating this board of health was codified in the code of 1881 under the title of "Quarantine of Vessels." Section 2186 of the code of 1881 created a "board of health for collection district of Puget sound." The board of health did not have jurisdiction over the whole territory of Washington but was limited to making and enforcing regulations respecting the quarantine of ships or vessels arriving at the port of entry in the Puget Sound customs collection district.

In 1891, the state legislature created the state board of health and bureau of vital statistics by chapter 98, Laws of 1891, p. 188, but the board was not in any sense simply a *successor* to the board of health for the customs collection district of Puget Sound. The board of health created in 1891 had statewide jurisdictioin over "the health and life of the citizens of the state," with "authority to make such rules and regulations and such sanitary investigations as they may, from time to time, deem necessary for the preservation or improvement of public health." In addition, the new board had supervision of the state system of registration of births and deaths and marriages.

Section 9 of the act of 1891, p. 190, provided that the five persons constituting the board of health should meet in January and June of each year, with the January meeting at the state capital. However, § 14 of the act, p. 191, not mentioned in the brief of the heads of the state agencies, provided:

"The secretary of the state shall provide room suitable for the meetings of the board and *office room for the secretary* [of the board of health]." (Italics ours.)

It is apparent from § 14 of the act that the legislature intended that the only paid employee of the board of health (the secretary, receiving $1,200 annually) should maintain the office of the board in quarters provided by the secretary of state, who by the mandate of the constitution had to keep his offices at the seat of government. Respondents concede that from 1892 until 1898 the office of the board of health was in Olympia. After 1898, the office was moved to Seattle, where the board of health has remained ever since. The department of health, successor to the old board of health and bureau of vital statistics, meanwhile has grown from an agency with a one-man staff to an agency with a large staff and with a biennial appropriation of millions of dollars.

After considering the history of the department of health and noting that the legislature which created its predecessor provided that its office should be at the seat of government, we have no hesitation in concluding that the framers of the constitution intended that such departments as the department of health should be at the seat of government. Furthermore, the history of the old fish commission does not demonstrate that the framers of the constitution intended that such agencies as the present department of fisheries and game commission should be exempt from the constitutional requirement that state executive offices should be maintained at the state capital.

This court held in *State v. Womack,* 4 Wash. 19, 29 Pac. 939, a case decided less than three years after the state constitution was adopted, that Article III, § 1, does not limit the executive officers of this state to the several elective officers named in that section of the constitution. In holding that a member of the state board of education was an executive officer of the state, the court said:

"The object of the constitution makers was to classify the executive departments of the state rather than to exclusively establish its executive officers. The language of the section is mandatory. It says 'The executive department

shall 'consist,' etc. If the contention of the respondents is correct, that the intention of the section was to limit the executive officers of the state, their further position that the legislature can by subsequent enactment increase those officers, is untenable, for the essence of a constitutional provision is its limitation on the power of the legislature, and when the constitutional provision is exclusive in its nature it is supreme, and it is not within the power of the legislature to vacate or alter it. Hence *their main contention would force us to the absurd conclusion that the constitution perpetually limits the executive officers of the state to the officers mentioned in said section. No known rule of construction will justify such a conclusion in this case.*" (Italics ours.)

Paraphrasing the language of the court in that early case, we might say that adopting the contention of the respondents in this case "would force us to the absurd conclusion that the constitution perpetually limits the executive officers of the state [who must maintain their offices at the seat of government] to the officers mentioned in said section." To that contention we must add, as the court did in *State v. Womack, supra,* "no known rule of construction will justify such a conclusion in this case."

In the later case of *State ex rel. North Coast Fire Ins. Co. v. Schively,* 68 Wash. 148, 122 Pac. 1020, we said:

"In *State v. Womack,* 4 Wash. 19, 29 Pac. 939, this court held that art. 3 of the constitution does not undertake to limit the executive officers of the state to those enumerated therein, but that the object of the framers of the constitution was 'to classify the executive departments of the state rather than to exclusively establish its executive officers.' The reasons for that holding as set forth in the last mentioned opinion, seem to us unanswerable. . . . If art. 3 of the constitution does not limit state officers to those therein enumerated, then there is no good reason why § 4 of art. 4, which confers original jurisdiction in mandamus 'as to all state officers' should be so limited. We are impelled to the conclusion that the insurance commissioner is such a state officer as, within the meaning of the constitution, is subject to the jurisdiction of this court in original proceedings for mandamus."

The court thus recognized again that the executive branch of the state government, which is compelled by Article III, § 24, to maintain offices at the seat of government, is not restricted to only those officers who are named in Article III of the constitution.

We point out that the state insurance commissioner is now and was at the time that the *Schively* case was decided an elective executive officer. However, when the constitution was framed and adopted, no provision was made in Article III for a state insurance commissioner. The first session of the state legislature enacted a statute to regulate and license the insurance business in the state (Laws of 1889-90, p. 240). This act designated the secretary of state (who was bound by the constitution to maintain his office at the capital) as the state insurance commissioner. The secretary of state continued to perform the duties of the insurance commissioner until the office of state insurance commissioner was created as an elective office by chapter 109, Laws of 1907, p. 207. That act, in § 4, provided:

"The State Insurance Commissioner shall keep his office at the State Capitol, . . ."

If the contention of respondents that only those executive officers named in Article III, § 24, of the constitution are required to maintain their offices at the capital is correct, the state insurance commissioner, elected by the vote of the people of the whole state, may move his principal office anywhere in the state if the legislature so provides. We think it is clear from the history of the controversy over the location of the seat of government that those who framed and adopted the constitution did not intend that subsequently created elective executive offices could be located anywhere except at the capital.

Respondents have placed their principal reliance in their argument on the merits on their contention that the plain intention of the framers of the constitution, as revealed by the language of that instrument, was to require only the executive officers named in the constitution to maintain their offices in the state capital. We have ruled against that

contention. Respondents advance a secondary contention that the case law from other jurisdictions supports their position that only the executive officers named in the constitution are bound by the constitutional mandate respecting the location of their offices at the seat of government.

In support of their secondary contention, respondents have cited three cases from other jurisdictions. None of them are controlling here. The first case is *State ex rel. Geiger v. Long,* 43 Mont. 401, 117 Pac. 104, which held only that the legislature could not by a *special* act instead of a *general* act create a new county from an old one and designate its county seat, since the constitution required such legislative acts to be *general* acts. *Whallon v. Circuit Judge for Ingham County,* 51 Mich. 503, 16 N. W. 876, held that the legislature had the authority to provide that two terms of the circuit court of Ingham county each year should be held at Lansing, the state capital, which was located in that county, rather than at Mason, the county seat. The court said that, inasmuch as the circuit court was a state court of general common-law jurisdiction with the judge paid by the state, the court was in no sense a "local court" such as the county court. Consequently, since "there has never been any express constitutional provision upon the subject in anywise limiting the power of the legislature to establish or change the place for holding the circuit court when once located," the court concluded that the act of the legislature providing for the holding of two terms a year away from the county seat was constitutional.

*Babcock v. Hahn,* 175 Mo. 136, 75 S. W. 93, the third case cited by respondents, held that a statute requiring the recorder to keep his office and records at the "seat of justice" in the county did not require him to maintain his office at the county courthouse. Instead, the court held the recorder could move his office and records to the city hall (situated in an area of the city which was not within the boundaries of the town when it was named the county seat) because an article in the state constitution provided that "All additions to a town which is a county seat shall be

included, considered and regarded as a part of the county seat."

None of the three cases cited by respondents on this phase of the case supports respondents' position.

Relators, on the other hand, have cited six cases which they assert uphold their position that the thirteen state agencies involved in this action are prohibited by the constitution from locating or maintaining their offices away from the seat of government. None of the cases cited by relators are directly in point here, however, as they all involve the legality of attempted legislative removal or location of seats of government or individual state offices. In the present case, it was stipulated that no statute was involved, so obviously the thirteen state agencies are not relying on any legislative authority for maintaining their offices away from the state capital. In fact, the record in this case does not disclose the reasons which caused the heads of each of the thirteen agencies to decide to locate their respective offices in Seattle.

The one case cited by relators which comes closest to being analogous to the case at bar is *State ex rel. McCain v. Metschan,* 32 Ore. 372, 46 Pac. 791, 53 Pac. 1071, decided by the supreme court of the state of Oregon in 1896. The Oregon constitution provided that "all the public institutions of the state, hereafter provided for by the legislative assembly, shall be located at the seat of government." The court held that an insane asylum was a public institution, and that consequently an act of the legislature providing for the establishment of an insane asylum away from the seat of government was void, saying:

"Although the language of the section quoted is somewhat involved, the evident intention of the framers of the constitution, and of the people when they adopted it, was to declare that all the public institutions of the state thereafter provided for by the legislature should be located at the seat of government. It amounts to and is, in effect, a constitutional location of such institutions, and the only power vested in the legislature is to determine the necessity for and the amount of money to be used in their construction and maintenance. Any attempt by that body to

108

expend the public revenue for the erection or maintenance of such an institution elsewhere is a mere nullity, and of no more force or validity than a legislative attempt to change the seat of government. *All such institutions must be located at the place designated in the constitution,* although it may now seem desirable to do otherwise, *until the consent of the people is obtained in the form of a constitutional amendment. In their sovereign capacity the people have so provided,* and no other power can alter or change their decree." (Italics ours.)

■ We must now notice a special plea made by the attorney general that,

". . . in the event the decree of the trial court should be affirmed, it should, in any event, be reversed as to the state power commission since it is not an agency of the state."

This contention (that the power commission is "not an agency of the state") is based upon RCW 43.52.270, which created the power commission by the following statutory language:

"There is hereby created the Washington state power commission, which shall be a body politic and corporate, a political subdivision of the state of Washington exercising governmental and public powers. . . ."

We find no merit in this contention. The power commission derives all powers it has from the state, was created by the authority of the state and was endowed by it with governmental and public powers. Although designated as a political subdivision of the state, the power commission is still a state agency existing only at the pleasure of the state. It exercises an important executive power and cannot be considered as being in a different category from the other twelve agencies.

■ In view of the history of the seat of government controversy in this state, culminating as it did in the framing of Article III, § 24, and Article XIV, §§ 1 and 2, of the state constitution, we hold that it was the evident intention of the framers of the constitution and the people who adopted it to require that all of the state executive offices be maintained at the seat of government.

In deciding this case, we have interpreted the state constitution in the only manner which appears to us to be reasonable in the light of the historical background which its framers and the people who adopted it necessarily must have had in mind at that time.

Some suggestion was made in the oral argument that the constitution should be interpreted liberally in the light of present day conditions. A similar contention is stated in the attorney general's brief as follows:

"The wisdom, or lack thereof, in permitting agencies to be located away from Olympia will never be answered to the satisfaction of everyone. Certainly constitutional interpretation, everlasting as it is, cannot be based upon the unfortunate experiences of a few. Unless the constitution clearly and expressly fixes the policy (which it does not) the matter had best be left to those departments of government which were created for the purpose of responding directly to the needs and desires of the people. These departments are, of course, the legislative, and the executive (through the office of governor). If the needs of the people dictate a change of policy, those departments will promptly respond. They are the proper forums for establishing public policy. The courts should not, and need not, be burdened with that obligation."

The vice of this reasoning is that it destroys the usefulness and the very purpose of a written constitution. The function of a state constitution under our form of government is well stated in 11 Am. Jur. 651, Constitutional Law, § 44, as follows:

"A written Constitution is not only the direct and basic expression of the sovereign will, but is the absolute rule of action and decision for all departments and offices of government with respect to all matters covered by it and must control as it is written until it shall be changed by the authority that established it. No function of government can be discharged in disregard of, or in opposition to, the fundamental law. The state Constitution is the mandate of a sovereign people to its servants and representatives. No one of them has a right to ignore or disregard its mandates; and the legislature, the executive officers, and the judiciary cannot lawfully act beyond the limitations of such Constitution."

 If it be a fact that public convenience and administrative efficiency can be promoted by maintaining the thirteen state agencies at Seattle or elsewhere than at the seat of government, the constitution may be so amended by majority vote of the people. They have reserved to themselves the sole power to change our state constitution. What we said in *State ex rel. Banker v. Clausen*, 142 Wash. 450, 253 Pac. 805, quoting with approval from 6 R. C. L. 46, is applicable to the present case:

" 'A cardinal rule in dealing with constitutions is that they should receive a consistent and uniform interpretation, so that they shall not be taken to mean one thing at one time and another thing at another time, *even though the circumstances may have so changed as to make a different rule seem desirable.* In accordance with this principle, a court should not allow the facts of the particular case to influence its decision on a question of constitutional law, nor should a statute be construed as constitutional in some cases and unconstitutional in others involving like circumstances and conditions. Furthermore, *constitutions do not change with the varying tides of public opinion and desire.* The will of the people therein recorded is the same inflexible law until changed by their own deliberative action; and therefore the courts should never allow a change in public sentiment to influence them in giving a construction to a written constitution not warranted by the intention of its founders.' " (Italics ours.)

Accordingly, we are bound by the mandatory language of Article III and Article XIV of the constitution as adopted by the people in 1889 until such time as the people see fit to exercise their sovereign right to change it.

Although the peremptory writ does not distinguish between the principal and branch offices of the thirteen agencies, the relators have conceded that they are not seeking to prohibit the location of branch offices away from the seat of government. Consequently, we deem it appropriate to point out that nothing in this opinion shall be construed as having any application to branch offices of the agencies involved.

From our consideration of the allegations of the petition (which are admitted by respondents' demurrer to be true)

and the applicable legal principles involved in this case, we conclude that the trial court was correct in overruling the demurrer on each of the five grounds stated therein.

The order of the trial court directing the issuance of the peremptory writ of mandate is modified by eliminating the governor as a party respondent, and, as so modified, it is hereby affirmed.

GRADY, C. J., MALLERY, SCHWELLENBACH, and OLSON, JJ., concur.

HILL, J. (dissenting)—The constitutional issue presented in this case stems from the following provisions of the state constitution:

"EXECUTIVE DEPARTMENT. The executive department shall consist of a governor, lieutenant-governor, secretary of state, treasurer, auditor, attorney general, superintendent of public instruction, and a commissioner of public lands, who shall be severally chosen by the qualified electors of the state at the same time and place of voting as for the members of the legislature." Art. III, § 1.

"RECORDS, WHERE KEPT, ETC. The governor, secretary of state, treasurer, auditor, superintendent of public instruction, commissioner of public lands, and attorney general shall severally keep the public records, books, and papers relating to their respective offices at the seat of government, at which place also the governor, secretary of state, treasurer, and auditor shall reside." Art. III, § 24.

The appellants here were the respondents in the superior court and will be herein, as in the majority opinion, designated as the respondents. The respondents on this appeal were the relators in the superior court and are so designated by the majority throughout that opinion, and will be so referred to here.

It is solely on the above two provisions that relators base their contention that respondents have violated the state constitution by failing to maintain the offices of their departments (i.e., their "public records, books and papers") at the seat of government, for if respondents do not fall within the mandate of Art. III, § 24, then the argument that they have violated the other constitutional provisions relative to

change of the seat of government can have no application or relevance.

It is significant that relators can point to no express provision of the constitution requiring all offices of the executive department of the government to be maintained at the seat of the government. The substance of their argument is that, because the officers enumerated in Art. III, § 24, *supra,* are (with the exception of the lieutenant governor) the same as those enumerated in § 1 of that article as constituting the executive department of the government, § 24 must be construed as requiring the heads of all the executive offices of the state to maintain their "public records, books and papers" at the seat of government.

The cases of *State v. Womack,* 4 Wash. 19, 29 Pac. 939 (1892), and *State ex rel. North Coast Fire Ins. Co. v. Schively,* 68 Wash. 148, 122 Pac. 1020 (1912), quoted and relied upon by the majority, do no more than hold that, by enumerating the officers constituting the executive department of the government, the framers of the constitution did not intend to prevent the legislature from subsequently increasing the number of officers or offices constituting that department of the government.

This is simply a recognition of the fundamental concept of our constitutional form of government. A state constitution is a limitation and not a grant of power, and the legislature is supreme except as its power is limited by the constitution. *James v. McMillan,* 113 Wash. 644, 194 Pac. 823 (1921); *State ex rel. Billington v. Sinclair,* 28 Wn. (2d) 575, 183 P. (2d) 813 (1947).

"The entire source of governmental authority is found in the people. Either directly or through the legislature they create such officers and agencies as they deem desirable for the administration of public functions and declare the quantum of power to be exercised by each. Their will, in these respects, finds its expression in the Constitution and laws." *State ex rel. Dragstedt v. State Board of Education,* 103 Mont. 336, 62 P. (2d) 330 (1936).

Subject only to limitations and restrictions imposed by the constitution, the power to create and abolish a public

office is vested in the legislative department of the government. *Edwards v. Town of Lake Pleasant,* 242 N. Y. S. 635 (1930); *O'Connor v. Greene,* 174 Misc. 597, 21 N. Y. S. (2d) 631 (1940); *Nichols v. Commissioner of Public Welfare,* 311 Mass. 125, 40 N. E. (2d) 275 (1942); 67 C. J. S. 119, Officers, §§ 9, 10.

In interpreting the meaning of the quoted provisions of our constitution, the majority makes no distinction between constitutional offices and offices created by statute. It is on that distinction that this dissent is based. As stated in *State ex rel. Grant v. Eaton,* 114 Mont. 199, 207, 133 P. (2d) 588 (1943):

" 'Constitutional offices differ in many ways from offices created by statute. Over the latter, the legislature has full control, whereas its power over constitutional offices is limited. It cannot abolish a constitutional office, nor can it change such an office, except as expressly permitted by the Constitution itself.' (42 Am. Jur., sec. 18, pp. 894, 895.)"

See, also, *Black v. Sutton,* 301 Ky. 247, 191 S. W. (2d) 407 (1945).

Through the provisions of Art. III, § 1, the framers of our constitution established the constitutional officers and offices of the executive department of the government. They provided for terms of office (Art. III, §§ 2, 3), elections (§ 4), duties and powers (§§ 5, 6, 7, 8, 9, 11, 12, 16, 17, 18, 19, 20, 21, 22, 23), salaries (§§ 14, 16, 17, 19, 20, 21, 22, 23), qualifications (§ 25), the location of the state seal and "public records, books and papers" (§§ 18, 24), and the manner of filling vacancies (§§ 10, 13). They further designated the extent to which changes could be made "by law," and in § 25 designated the offices which the legislature, in its discretion, could abolish. Except in the manner expressly provided, the legislature has no authority to change or alter the mandates of the constitution concerning these constitutional offices.

The legislature is vested with sole authority to

" . . . create a public office, other than one created by the Constitution, provide for the election or appointment of its incumbent, establish and modify from time to time its

tenure, compensation and duties, and abolish the office as the public interest may require." *Cullen v. Mayor of Newton,* 308 Mass. 578, 580, 32 N. E. (2d) 201 (1941).

In short, in the absence of some constitutional limitation, the legislature *has the power to impose either the same or different limitations* on the offices which it creates as were imposed by the framers of the constitution upon the offices created by that instrument.

What the majority does here is read into the constitution an intent by its framers that the designation of the location of the offices which it created and which, in the manner designated, were withdrawn from legislative control, should also apply to offices created under the power vested in the legislature. I am convinced that the framers of the constitution had no such intent, and that such a construction of the quoted provisions is not justified by nor consistent with the recognized rules for constitutional construction.

The majority recognizes that the framers of the constitution were aware of the necessity for subsequent creation of offices of the executive department by legislative enactment as the public interest might require, and that they did not intend to deprive the legislature of its power to create such offices. Granting this and the additional fact that the provisions of the constitution are a limitation and not a grant of power, I can find neither reason nor justification for reading into those constitutional provisions a limitation on the power of the legislature to determine where the public offices which it creates shall be maintained.

The whole purpose of Art. III is to designate those matters relating to the offices there enumerated which were thereby removed from legislative control. This was the intent of the framers and the extent to which the limitations therein contained can be extended. In the absence of some further limitation, the power to legislate concerning any other public offices was left wholly to the legislature.

It is true, as the majority indicates, that the only offices of the executive department provided for in the constitution are those enumerated in Art. III, § 1. The legislature

had not yet met, and had had no opportunity to exercise its power to create additional offices. I am unable to follow the reasoning that, because no other offices in that department were created by the constitution, the framers of that document could not have intended to exclude offices subsequently created by the legislature from limitations which they placed upon offices created by the constitution. Furthermore, the question is not whether they intended to *exclude* such offices, but whether they intended to *include* them. The framers of the constitution recognized the right of the legislature to create such offices, and if it was their purpose to limit the right of the legislature to determine the location of such offices, they could have expressly done so. In the absence of such a limitation, the legislature's control over the location of the public offices which it creates is complete.

Therefore, instead of upholding the position of the relators with an admonition to respondents that their remedy lies in the provisions for the amendment of the constitution, we should put the shoe on the other foot; an admonition should be extended to the relators that their remedy lies in an appeal to the legislature.

The determination of the location of offices of the executive department created by the legislature lies within the exclusive control of the legislative branch of the government in the absence of a constitutional restriction, and Art. III, § 24, is not such a restriction. Under our form of government, the location of these offices is a political, not a constitutional, question.

For these reasons, the demurrer to the petition should have been sustained.

HAMLEY, WEAVER, and FINLEY, JJ., concur with HILL, J.